SYLVAN PEYROUX AND OTHERS, CLAIMANTS OF STEAMBOAT
PLANTER, APPELLANTS v. WILLIAM L. HOWARD AND FRAN-
COIS VARION, LIBELLANTS.

A libel was filed in the district court of the United States for the eastern
district of Louisiana, against the steamboat Planter, by H. and V., citizens
of New Orleans, for the recovery of a sum of money alleged to be due
to them, as shipwrights, for work done and materials found in the repairs
of the Planter. The libel asserts that, by the admiralty law and the
laws of the state of Louisiana, they have a lien and privilege upon the
boat, her tackle, &c. for the payment of the sums due for the repairs and
materials, and prays admiralty process against the boat, &c. The answer
of the Planter avers that they are citizens of Louisiana,
residing in New Orleans; that the libellants are also citizens, and that
the court have no jurisdiction of the cause. Held, that this was a case of
admiralty jurisdiction.

By the civil code of Louisiana, workmen employed in the construction or
repairs of ships or boats enjoy the privilege of a lien on such ships or
boats, without being bound to reduce their contracts to writing, what-
ever may be their amount; but this privilege ceases if they have allowed
the ship or boat to depart without exercising their rights. The state
law, therefore, gives a lien in this case.

In the case of the General Smith, 4 Wheat. 438, S. C. 4 Peters's Condensed
Reports, it is decided that the jurisdiction of the admiralty in cases where
the repairs are upon a domestic vessel, depend upon the local law of the
state. Where the repairs have been made or necessaries furnished to a
foreign ship, or to a ship in the ports of a state to which she does not be-
long, the general maritime law gives a lien on ships as security; and the
party may maintain a suit in the admiralty to enforce his right. But, as
to repairs or necessaries in the port or state to which the ships belong,
the case is governed altogether by the local law of the state; as no lien
is implied unless it is recognized by that law. But if the local law gives
the lien, it may be enforced in the admiralty.

The services in this case were performed in the port of New Orleans, and
whether this was within the jurisdiction of the admiralty or not, depends
on the fact whether the tide in the Mississippi ebbs and flows as high up
the river as the port of New Orleans. The court considered themselves
authorized judicially to notice the situation of New Orleans, for the pur-
pose of determining whether the tide ebbs and flows as high up the river
as that place; and being satisfied that although the current of the Mis-
sissippi at New Orleans may be so strong as not to be turned backwards
by the tide, yet the effect of the tide upon the current is so great as
occasions a regular rise and fall of the water; New Orleans may be pro-

[Peyroux and others v. Howard and Varion.]

perly said to be within the ebb and flow of the tide, and the jurisdiction of the admiralty prevails there.

In order to the decision whether the admiralty jurisdiction attaches to such services as those performed by the libellants, the material consideration is, whether the service was essentially a maritime service, and to be performed substantially on the sea or tide water. It is no objection to the jurisdiction of the admiralty in the case, that the steamboat Planter was to be employed in navigating waters beyond the ebb and flow of the tide. In the case of the steamboat Jefferson, it was said by this court that there is no doubt the jurisdiction exists, although the commencement or termination of the voyage may happen to be at some place beyond the reach of the tide.

Some of the older authorities seem to give countenance to the doctrine that an express contract operates as a waiver of the lien: but it is settled at the present day, that an express contract for a stipulated sum is not of itself a waiver of a lien; but that, to produce that effect, the contract must contain some stipulations inconsistent with the continuance of such lien, or from which a waiver may fairly be inferred.

APPEAL from the district court of the United States for the eastern district of Louisiana.

In the district court a libel was filed on the 10th December 1830, by Howard and Varion, shipwrights, residing in New Orleans, against the steamboat Planter, claiming the sum of two thousand one hundred and ninety-three dollars and thirty-five cents, being the balance asserted to be due to them for the price of work, labour, materials furnished and repairs made on the said boat, under contracts of 13th September and 19th October 1830; and alleging that, by the admiralty law and the law of the state of Louisiana, they had a lien on the said boat for the payment of the same; and that she was about leaving the port of New Orleans, and praying process, &c. The account for the work, materials, &c. was annexed to the libel.

The owners of the steamboat Planter filed a claim and plea setting forth that they were all citizens of Louisiana, all resided in the city of New Orleans, and that the libellants were also citizens of that state; and that therefore the district court of the United States had not jurisdiction of the case.

By a supplemental answer the respondents denied all the facts set forth in the libel.

The plea to the jurisdiction of the court was overruled and dismissed; and the parties proceeded to take the testimony of witnesses by depositions, which were filed as part of the proceedings in the case.

By the first contract, the shipwrights stipulated to do certain specified work, and furnish certain materials, the same to be approved by "experts," for which they were to be paid the sum of one thousand one hundred and fifty dollars.

By the contract of the 19th of October the Planter was to be hauled on shore, and in consideration of four hundred and ʒnty-five dollars, of which two hundred was to be paid in cash, and two hundred and seventy-five in one month after the boat should be launched and set afloat, certain other repairs were to be done to her, and she should be delivered and ready to receive a cargo by the 20th of November, under a penalty of twenty-five dollars per day for each day her delivery should afterwards be retarded by the shipwrights.

The evidence in the case is fully stated in the opinion of the court.

The district court made the following decree.

"The libellants claim a balance due them of two thousand one hundred and ninety-three dollars and thirty-five cents for work and materials furnished in the repairs of the steamboat Planter at the request of the claimants, and for which they have a lien by the local law. The claimants, in their first answer, deny the jurisdiction of the court, on the ground that all the parties were citizens of the same state, to wit, of Louisiana; that objection, however, was not insisted upon at the trial, and is not sustainable on the admiralty side of this court. In their supplemental answer, they deny generally the allegations of the libellants, and pray for the dismissal of the libel and damages. The whole account of the libellants against the owners amounts to three thousand six hundred and ninety-three dollars and thirty-five cents, including the amount of the written contracts entered into between the parties; of this sum they acknowledge the payment of one thousand five hundred dollars, leaving, as they allege, a balance of two thousand one hundred and ninety-three dollars and thirty-five cents due

them. By the first contract, made on the 11th September 1830 (the boat being then in the water), the libellants agreed, for the sum of one thousand one hundred and fifty dollars, to make certain repairs on that part of the boat which was above water, *from the wheel house to the bow;* and it was further stipulated, that if they made any other repairs, by replacing unsound timbers in any other part of the boat above water, not then discovered, they were to be paid separately for so much. After commencing the work, it was perceived that the boat required repairs under the water as well as above, and in consequence of that discovery, the claimants, through captain Jarreau, master of the boat and one of the owners, agreed to pay the libellants four hundred and seventy-five dollars for hauling out the boat, and for launching her when she should be repaired; and as the quantity of work to be done was uncertain, it was stipulated that an account of it should be kept, and if approved of by captain Jarreau, under whose inspection the work was to be done, the claimants bound themselves to pay the amount thus to be ascertained: this latter contract was made on the 19th October last. After the boat was *hauled out,* it appears the work under both contracts was carried on simultaneously. On a first view of the account current exhibited in this case, it would seem, from the dates, that at least a part of the work to be done under the first contract was again charged, but the subsequent testimony taken in this case shows that these charges were made on account of the extra repairs provided for under the first contract; and it further appears that all the charges made after the 19th of October, have no relation to the first agreement, but all relate to the work contemplated by the second contract. From the complexion of the testimony taken by the complainants, their real defence seems to be that the prices of the work charged are greater than they should be, that it was not executed in a proper manner, and that the libellants have forfeited a considerable sum of money in consequence of not delivering the boat within the time stipulated in the contract. As to the two first objections, the evidence is conclusive in favour of the libellants; captain Jarreau, himself, upon being shown the account, did not object to it; on the contrary, expressed himself satisfied with the work, and said

he was "not surprised at it, because there was a great deal more work done than he had any idea of;" with respect to the non-delivery of the boat at the time agreed upon, the fault chiefly attachès to captain Jarreau, who, in several instances, retarded the work by opposing repairs which were proposed by the libellants, but which turned out to be indispensable, and were afterwards ordered by him to be made; besides, he promised them indemnity against their obligation to pay twenty-five dollars a day for every day they were in default in delivering the boat, and gave as the reason, that they had to do more work than was at first anticipated. The charge of four hundred and seventy-five dollars, is for the specific service of hauling out and launching the boat, and must be allowed as such. On the whole, the evidence and exhibits in the case fully sustain the demand of the libellants; it is therefore ordered, adjudged and decreed, that the claimants pay to them the said sum of one thousand one hundred and ninety-three dollars and thirty-five cents, and costs of suit."

From this decree the owners of the Planter appealed to this court.

The case was argued for the appellants by Mr Morton. Mr Livingston submitted a printed argument.

For the appellants it was contended:

1. It does not appear, upon the proceedings, that the court below had jurisdiction.

2. That the libellants had waived any privilege or lien upon the said steamboat, under the laws of Louisiana, and therefore proceedings in rem were improper.

3. Though the court had jurisdiction, yet the decree rendered is erroneous.

On the first point, "that it does not appear, upon the proceedings, that the court below had jurisdiction;" Mr Morton contended, that jurisdiction should appear affirmatively, for the district courts of the United States are of limited jurisdiction, and their proceedings are erroneous if the jurisdiction be not shown upon them. Kemp's Lessees v. Kennedy, 5 Cranch, 184; Walker v. Turner, 9 Wheat. 341. And this rule is ap-

plicable to all courts of inferior jurisdiction (Stanyon v. Davis, 6 Mod. 224; the Lord Coningsby's case, 9 Mod. 95); and has been adopted by the appellate court, from the earliest periods of judicial history, for the purpose of restraining inferior tribunals within their appropriate spheres of action, and preventing the possibility of their passing those bounds, even by the assent of parties below, to the erroneous exercise of power.

To sustain the jurisdiction of the court below, it must appear affirmatively, either that the Planter was a "foreign vessel," or, being a domestic vesse', that the lien or privilege created by the laws of Louisiana, constituted her a proper subject for the action of a court of admiralty. The first is not contended for on the part of the libellants; and to maintain the second, it must be shown affirmatively, that the Planter "was engaged in a maritime employment," being a navigation "super altum mare," or "substantially upon waters within ebb and flow of the tide;" constituting a case of admiralty jurisdiction, as recognized "by the law, admiralty and maritime, as it has existed for ages," which alone, the admiralty courts of the United States act under, and have authority to administer to the cases as they arise. The Steamboat Thomas Jefferson, Johnson claimant, 10 Wheat. 428; American Insurance Company v. Canter, 1 Peters's Rep. 545; The St Jago de Cuba, 9 Wheat. 409, 416; The General Smith, 4 Wheat. 438; Ramsey v. Allegree, 12 Wheat. 611; Ship Robert Fulton, 1 Paine's C. C. Rep. 545. Admiralty jurisdiction is not then to be inferred, because a vessel is the subject, and a state law has created a lien, however positively these facts may be alleged upon a record, and remain uncontroverted: a converse doctrine would have sustained the jurisdiction in the case of the Jefferson, before cited; and would equally establish an admiralty jurisdiction, where state laws had created liens, whether upon tideless rivers or upon the waters of the lakes: in all of which cases, it may be observed, that the vice-admiralty colonial courts would have exercised jurisdiction by virtue of their peculiar commissions; but not as cases of admiralty jurisdiction, which they never were, and to constitute them such would not be within the power of congress: though to a certain extent, a jurisdiction over them might be conferred upon

the district courts, under the power "to regulate commerce among the states," as is intimated in the case of the Jefferson. For the extent of power conferred on the vice-admiralty courts by their commissions, see 2 Gall. 470, note 47, for Commis. of V. Ad. Court.

"A libel not alleging a thing done 'super altum mare,' nothing appears to give the court jurisdiction; for a man shall not sue in the admiralty only because it is a vessel." "The principal" must be shown to be within their jurisdiction. Shermoulin v. Sands, 1 Lord Raym. 271; 1 Kent's Com. 353; Hall's Ad. Prac. 135, 137; 2 Brown's Civ. and Ad. Law, 271.

What does appear upon the record, is relied upon to be sufficient for inferring jurisdiction in the court below.

The libel only alleges, that the libellants have a lien and privilege upon said boat by the admiralty law, and by the law of Louisiana; being merely a statement of consequences, that could but give jurisdiction of the case to the court as a result, should it appear by further facts, that the Planter was engaged in a "maritime employment," navigating "super altum mare," or "waters within ebb and flow of the tide;" neither of which are to be found in any part of the record of the proceedings below, and in the absence of which, the clear bearing of the authorities indicates that no jurisdiction can ever be inferred: "the case not appearing to be a maritime contract, nor made such by the state law," which it is admitted must be done to maintain the jurisdiction of the court.

It would seem to have been conceded on the part of the libellants, that were the inception, progress and *termini* of the Planter's employment, beyond ebb and flow of the tide, or substantially such, the case would clearly be within that of the Thomas Jefferson, 10 Wheat. 428. It is submitted with some confidence, that this state of facts is but a fair inference from the whole record of the case.

It is by no means conceded that New Orleans is within the ebb and flow of the tide; on the contrary, that the court will notice the notorious and historical fact that it is beyond the ebb and flow of the tide; that the Mississippi river is not an arm of the sea, nor an inlet from the ocean, but an inland river, whose current assumes but one course or flux to the

ocean, and is uninfluenced by its tides. The Apollon, 9 Wheat. 374. 3 Dall. 297. Hooker v. Cummings, 20 Johns. Rep. 98. Malte Brun's Geography, vol. 5, p. 58, book 79, ed. of 1826. Stoddard's Louisiana, 164, ch. 4.

An arm of the sea is where the sea or tide "flows and reflows." Sir Henry Constable's case, 5 Coke's Rep. 107. A navigable river is also considered as an arm of the sea; but there is an important distinction between the legal and popular import of the term "navigable," as applied to rivers; and no part of the law is more clearly settled, than that to determine, whether or not a river is navigable, a regard must be had to the "ebbing and flowing of the tide." For those streams of water which are of public use for inland navigation above the line to which the tide ordinarily flows, are strictly "not navigable," though they are public highways, for the purpose of transportation; although the water is fresh at full tide, yet the river is still an arm of the sea if it "flows and reflows."

This has never been controverted in England, and is well settled in this country. Angell on tide waters, chap. 4, p. 60, ed. of 1826, where will be found collected all the English and American authorities upon the subject.

"The tide is not felt at New Orleans. The rise and fall of the river is caused exclusively by the rainy and dry season in the interior; at low water the flow to the sea is scarcely perceptible." From the surveyor general of Louisiana. Hall's Travels, vol. 2, 284.

The tides have little effect upon the water at New Orleans. They "sometimes" cause it to "swell" but never to "slacken its current." Stoddard's Louisiana, 164, ch. 4.

The employment of the Planter, thus, in its inception, appearing not to have been of a maritime nature, is shown in its further progress to have been exclusively beyond the ebb and flow of the tide. The second contract states that the boat is to be delivered "ready to receive a cargo." The testimony shows her to have been "launched and partly laden." The return of the marshal shows her redelivery to claimants. The testimony of Wilson states Jarreau to have acted as commander when the Planter was launched, and as commanding her at the time witness gave his evidence. The

[Peyroux and others v. Howard and Varion.]

affidavlt of claimants states that Captain Jarreau was then na-vigating "on the Mississippi, between New Orleans and Bayou Sarah, and on the Red river between New Orleans and Alexandria."

As in the case of the Jefferson, the court noticed that Shipping port was beyond ebb and flow of tide, without any positive evidence appearing on the record; so will they notice the same fact, as to New Orleans, Bayou Sarah, Alexandria, Baton Rouge, and Red river. The last four places being also historically noted as equally beyond tide water. Darby's Louisiana, 95, 197. Stoddard's Louisiana, 165, 186

The record then affords evidence that the Planter, having been redelivered to the claimants, and laden with cargo, was employed, not in "maritime service," nor in trading "to Mobile, Pensacola, or intermediate places," but in navigating between New Orleans, Bayou Sarah, Red river, and Alexandria, presenting a case of "interior trade," wherein the inception, intermediate progress and termination of the voyage were wholly beyond admiralty jurisdiction. On the part of the libellants, it is assumed that New Orleans is within tide water, and a doctrine thereupon is applied drawn from the case of the Jefferson, 10 Wheat. 428, that admiralty jurisdiction is sustainable when the "*inception*" of the contract, &c. is thus circumstanced. But that case we suppose to establish a converse doctrine. The "*inception*," &c. being there noticed by the court as not answering to the idea of a navigation "substantially" beyond tide waters, so as to oust admiralty jurisdiction, and consequently not sufficient to confer jurisdiction, were alone relied upon as substantially "a maritime employment."

It is not perceived in what manner the inferences adverse to the jurisdiction below become negatived, or the defective libel aided through the evidence of a public act making New Orleans a port of entry. Could an analogous law for Shipping port in Kentucky, have varied the views taken by the court of that case? The general collection law of March 1799, sec. 4, creates various ports of entry and delivery upon Lake Champlain, Ontario, and Lake Erie; and supposing a case similar to the present to be now before the court from the northern district of New York, the force of these laws is not realized, if

invoked to aid the court in determining admiralty and maritime jurisdiction upon those waters. "Cases in admiralty do not arise under the constitution and laws of the United States." Amer. Ins. v. Canter, 1 Peters, 545.

The pleadings on the part of the claimants are not only sufficient to sustain all the exceptions now taken, but to warrant the inference, that they were taken below and overruled. They plead to the jurisdiction: first, on the ground that all the owners are residents, &c., which having been overruled, subsequently a supplemental answer and plea were filed, denying generally all the allegations contained in the libel. Neither the reasons for disallowing the objections to the jurisdiction, if offered, under both of these-pleadings, nor the objections themselves, appear; the court below, alone noticing that part of the evidence, upon which, "in *its judgment*" the real defence of the claimants rested.

Under the first point then, it is believed that the court will either dismiss the case as not showing jurisdiction upon the face of the proceedings, or remand the same, for the purpose of settling the facts upon which the jurisdiction must rest, if it is to be sustained.

The second point made on the part of the appellants is—that the libellants had waived any privilege or lien upon the boat, under the laws of Louisiana, and, therefore, proceedings "in rem" were improper.

In other words, that the inference is fairly deducible from the case, that it was within the contemplation of the parties, that their contracts should not create a right to "provisional seizure," under articles 284 and 289 of the Code of Practice of 1830, p. 104, and article 2748 of the Civil Code.

It is observed on the part of libellants, that, in this case, extraordinary diligence was used to enforce a right which would have been lost, had the vessel been permitted to depart without its exercise; and the inference would seem to be suggested, that probably such a state of things was within the contemplation of libellants, when entering into the agreements. It is certainly true, that article 2748, referred to, declares the privilege to cease, if the boat is allowed to depart without exercising the right of seizure.

But this effect takes place only, if the contract should not have been reduced to writing; and if the amount should exceed five hundred dollars, and the contract be *reduced to writing*, the privilege may be unlimited. Civil Code, article 2743, 2747. The "curia philippica," "quoad" liens or privileges on vessels, is supposed to have been abrogated by articles 3521, 2746 and 2748 of the Louisiana civil code; although referred to as yet subsisting, in a note to Abbott on Shipping, p. 116, ed. of 1829.

The reducing the contract to writing, may then be fairly taken as expressing the intention of the parties, that the right to a provisional seizure should be wholly suspended, but the right preserved until the return of the vessel, and to be exercised only in the event of a failure of personal responsibility on the part of claimants, to which, by the terms of the contract of 19th October, the libellants alone think proper to look. That full reliance must have been placed in the immediate return of the Planter to New Orleans, is apparent, from the fact of her ownership and commercial employment there, as well as by the evidence upon the record, showing New Orleans to have been the inception and termini, after her voyage upon the rivers throughout the interior of the country. And as conclusively affirming this view of the intention of the libellants, is the further fact evidenced by the contract of the 19th October, of extending a *credit* of two hundred and seventy-five dollars, forming a portion of the aggregate sum, to one month after the Planter should have been launched, set afloat and delivered, ready to receive a cargo—an evident suspension of the right to provisional seizure, until after the Planter must have left the jurisdiction of the court, showing clearly that such an understanding existed between the parties as justifies an application of the principle in the note to Raitt v. Mitchell, 4 Campbell, 150, and which is conceded to be entirely compatible with the laws of Louisiana.

The construction placed upon the contract of 19th October by the libellants, limits it to "thirty days after the vessel should be set afloat;" but it is presumed this limitation will not be sanctioned, and when the whole contract is brought

into notice and its parts viewed in connexion, that construction contended for by the appellants, must be affirmed.

Under the second point, then it is admitted, that superadding to other corroborating circumstances, the extension of credit for a portion of the aggregate amount involved, to a period after the right to provisional seizure could have been exercised, brings the case within the doctrine of Raitt v. Mitchell, 4 Campb. N. P. 150.

The third point relied upon by the appellants is, that the decree rendered, is erroneous. In support of this position Mr Morton went into a particular examination of the evidence. This part of the argument is stated and examined in the opinion of the court.

The decree rendered is further erroneous, in that it directs four hundred and seventy-five dollars, charged in the account of libellants for drawing the boat out of the water, to be paid to them; of which sum, two hundred and seventy-five dollars, by the express terms of the contract of 19th October, were not demandable until "one month after the libellants had delivered the Planter afloat, and ready to receive a cargo."

[Here the counsel went into a particular examination of the evidence.]

The regulation of the subject of "liens or privileges," and provisional seizure, by the laws of Louisiana, will be found mainly to have in view the internal trading navigation of the country, from New Orleans. Art. 284 of the Code of Practice of 1800, which is a comment upon Art. 2748 of the Civil Code, has alone reference to "water craft within the state," and Art. 289 of the same, after dealing much in detail upon "lien and provisional seizure of ships, vessels or water craft, navigating within the state," in a separate section, and as an exception to the general purview and scope of the legislation, further provides that "such seizure may be made 'even' of ships or vessels trading out of the state," and their laws appear to have had in view, among other subjects, the intricate matters of dispute, involved with the peculiar internal steamboat navigation from New Orleans, by affording various aids and facilities, susceptible of being adapted to most of the difficulties that would arise, and of which aids their courts have express power

to avail themselves. Thus from Art. 441 to 461 of the Code of Practice of 1830, are recognized, "experts," persons versed in the knowledge either of a science, an art, or a profession, selected in order to give their opinion, on some point or question, on which the decision of a cause depends." Also, "auditors" of accounts, "judicial" arbitrators, &c. &c. whose detailed services are therein fully enumerated; but none of whom, it is supposed, could be required to act by the district court of the United States, however essential to the elucidation of a cause.

From the decisions of the inferior tribunals, invested with cognizance of these cases, the right of appeal, and a speedy final determination of the appellate court is carefully provided for by art. 570 to 603 of the Code of Practice for Louisiana of 1830.

In conclusion, it is submitted that, if the inference be not decidedly adverse to the jurisdiction below, upon the face of the proceedings, yet important facts identified with that jurisdiction, do appear of so doubtful and unsettled a character as to render it proper to remand the case for a satisfactory establishment of those facts.

That, although it should be considered that proceedings below "in rem" were proper, yet material errors having been obviously incorporated with the decree, renders its enforcement impossible, and makes it now essential for the ends of justice, that the whole subject be remanded for that full re-investigation, through which those ends can alone be attained.

Mr Livingston, for the appellees, stated:

The main objection to the decree in this case is, that the district court of Louisiana, as a court of admiralty, had no jurisdiction of the case.

The libellants contend for the jurisdiction on the privilege granted by general maritime law; and on the express lien given by the laws of the state.

1. The general maritime law. Cases are abundant to show that shipwrights have a privilege on the ship for repairs and a right to libel her to enforce it. Roll's Ab. 533; 1 Peters's Admiralty Reports, 227, 233.

2. The laws of the state give the privilege without reducing the agreement to writing, as is required in other cases. Louisiana Civ. Cod. art. 2748.

It is argued that a state law cannot give jurisdiction to a court of the United States. In one sense this is true: a state law cannot extend such jurisdiction, but they may create a right which can only be enforced by such a court. For instance, by the general admiralty law, a master of a ship cannot sue in the admiralty for his wages by a libel on the ship, because, by the maritime law, he has no lien on the vessel. But suppose a state law to give such lien for all contracts made with the owners in the state, the maritime court of the United States, it is apprehended, would take cognizance of the case, and enforce the law. This, it is acknowledged, would not be done unless the case made by the state is a maritime contract. Is this such an one? . In the case of Jefferson, 10 Wheat. the mariners could not sue in the district court, because the service, in its inception, progress and termination, was above the ebb and flow of the sea; the inference then is plain, that if the contract and service had, either in the beginning, end, or any intermediate point, been within the ebb and flow of the sea, the decision would have been different. In the present case the contract was made, the work begun and completed in a seaport, where there is a regular flux and reflux whenever the river is in its ordinary state.

Should it be objected that it does not appear that the steamboat in question was intended, after her repair, to navigate within the ebb and flow, the answer is, first, that the presumption must be that she was intended to navigate to and from the place where her owners resided and where she was repaired; that, at any rate, the inception of her first voyage must be from the seaport where she was. Whether to go on the coasting trade by sea to Mobile, Pensacola, or the intermediate places, or to ply between the sea and the port, is at least as probable as that she was for the interior trade. Nor was it necessary for the libellants to state this. In a libel for repairs of a vessel, it is sufficient to describe it by the name given to vessels of that class, as ship, schooner, &c. without averring that the repairs were intended to enable her to prose-

[Peyroux and others v. Howard and Varion.]

cute a sea voyage; yet vessels of all descriptions sometimes navigate waters above the flux and reflux of the sea. So, in the present case, it was sufficient to call the vessel, on which the repairs were done, a steamboat; for steamboats are as frequently, and perhaps more so, employed on tide-water, as above it. If the exception were material, it ought to have been made by the answer; but here the objection in the answer is merely to the person of the libellants.

If it should be objected that the fact of New Orleans being within the ebb and flow of the sea is not in evidence, the answer is, that there are notorious facts with which courts are supposed to be conversant, and of which they will take notice without further proof. Thus, in the case of La Vengeance, 3 Dall. 297, 1 Peters's Cond. Rep. 132, the court takes official notice of the situation of Sandy Hook; and in the case from 20 Johnson, cited by the defendant, they assume, in like manner, that Salmon river is a fresh water river, and that it has no flux and reflux. In the case before the court, there is moreover the evidence of a public act, making New Orleans a port of entry and delivery.

The second error assigned in the printed statement is, that the libellants had waived any privilege or lien on the steamboat by the laws of Louisiana. If this were made out, it would not affect the right of the libellants under the law maritime. But it is not perceived that there is any evidence of such waiver. The article which gives the privilege declares that it shall be lost if the party suffer the vessel to depart without exercising the right; and this is the only condition. But in this case extraordinary diligence was used, and the libel calls for the immediate interposition of the court to prevent the departure. The vessel crossed the river from the ship-yard on the 8th of December, the libel was filed on the 10th, and the seizure made on the 11th of the same month.

That an express contract for a specific sum is not a waiver of the privilege is proved by the case cited by the defendant from 4th Camp. 150. Such a rule could only have been made by using the word *credit* in a sense in which it was not employed. The workman may be said to perform his labour on the credit of the owner, when he takes his promise for a certain

[Peyroux and others v. Howard and Varion.]

sum to be paid in cash on the finishing of the work; and in this sense the rule applies, and was considered an implied waiver of the privilege. In the case before the court there are two different contracts, both written. By the first, for certain specified repairs, the owners agree, "in the name of the boat," to pay in cash one thousand one hundred and fifty dollars; by the second, it being found it would be necessary to haul up the boat, four hundred and seventy-five dollars were agreed to be paid for that service, two hundred in cash, and two hundred and seventy-five in thirty days after the boat should be set afloat; and it is further agreed that the libellants should caulk and repair the boat so that she shall not leak, to be paid for as soon as the account shall be approved. Here, it will be observed, that no term of time was given for any part except the two hundred and seventy-five dollars for hauling up the boat; this was to be paid thirty days after the boat was *set afloat.* When that happened does not appear. She came over to the town side of the river on the 8th of December, but when she was launched was not said. Part of the one thousand five hundred dollars paid may then be reasonably imputed to this balance of two hundred and seventy-five dollars, because the debt for the extra repairs was not due until they were finished, and it appears they were not finished until the suit was brought. Where then there are two debts, one already payable, the other not, a sum paid without designation shall be imputed to that which is due. Civil Code, article 2162. Therefore, this part of the debt, on which credit was given being extinguished, no question can arise as to the lien for the balance.

There remain now only the objections to the sum allowed. On this point the court is referred to the full and conclusive testimony offered by the libellants, that all the materials and workmen they furnished were necessary—that they were actually furnished—that they are not overcharged—that the work was carried on under the inspection of the captain, and was acknowledged to have been executed to his satisfaction.

Mr Justice THOMPSON delivered the opinion of the Court.
This case comes up from the district court of the United

[Peyroux and others v. Howard and Varion.]

States for the eastern district of Louisiana. The proceedings in the court below were in rem against the steamboat Planter, to recover compensation for repairs made upon the boat.

The libel states that Howard and Varion, shipwrights, residing in the city of New Orleans, had found materials and performed certain work on the steamboat Planter, for which the said steamboat and her owners were justly indebted to them in the sum of two thousand one hundred and ninety-three dollars and thirty-five cents; and alleges that by the admiralty law, and the laws of the state of Louisiana, they have a lien and privilege upon the boat, her tackle, apparel and furniture for the payment of the same; and prays admiralty process against the boat, and that the usual monition may issue.

The appellants afterwards appeared in court and filed their claim and plea, alleging that they are citizens of Louisiana, and residing in the city of New Orleans, and that they are the sole and lawful owners of the steamboat Planter; and alleging further, that the libellants are also citizens of the same state, and that the court had no jurisdiction of the case.

The plea to the jurisdiction of the court was overruled, and a supplemental and amended claim and answer filed, denying all and singular the facts set forth in the libel; and by consent of parties an order of court was entered, that the testimony of the witnesses for the respective parties be taken before the clerk of the court, and read in evidence upon the trial, subject to all legal exceptions; and upon the hearing of the cause the court decreed that the claimants should pay to the libellants two thousand one hundred and ninety-three dollars and thirty-five cents, and costs of suit. An appeal to this court was prayed and allowed.

Upon the argument here, the following points have been made.

1. It does not appear upon the proceedings, that the court below had jurisdiction of the case.

2. That the libellants had waived any privilege or lien upon the steamboat under the law of Louisiana, and therefore proceedings in rem were improper.

3. If the court had jurisdiction, the decree is erroneous on the merits.

[Peyroux and others v. Howard and Varion.]

The want of jurisdiction in the district court is not put on the ground set up in the plea in the court below, that all the parties were citizens of the same state. This has been very properly abandoned here, as entirely inapplicable to admiralty proceedings in the district court. But it is said that it does not appear upon the face of the proceedings, that the cause of action properly belonged to admiralty jurisdiction. There can be no doubt that it must appear from the proceedings, that the court had jurisdiction of the case.

The proceeding is in rem against a steamboat, for materials found and work performed in repairing the vessel in the port of New Orleans, as is alleged in the libel, under a contract entered into between the parties for that purpose. It is therefore a maritime contract; and if the service was to be performed in a place within the jurisdiction of the admiralty, and the lien given by the local law of the state of Louisiana, it will bring the case within the jurisdiction of the court.

By the Civil Code of Louisiana, article 2748, workmen employed in the construction or repair of ships and boats enjoy the privilege established by the code, without being bound to reduce their contracts to writing, whatever may be their amount; but this privilege ceases if they have allowed the ship or boat to depart without exercising their right. The state law, therefore, gives a lien in cases like the present.

In the case of the General Smith, 4 Wheat. 438, it is decided, that the jurisdiction of the admiralty in such cases, where the repairs are upon a domestic vessel, depends upon the local law of the state. Where the repairs have been made, or necessaries furnished to a foreign ship, or to a ship in the ports of a state to which she does not belong, the general maritime law gives a lien on the ship as security, and the party may maintain a suit in the admiralty to enforce his right. But as to repairs or necessaries in the port or state to which the ship belongs, the case is governed altogether by the local law of the state, and no lien is implied unless it is recognized by that law. But if the local law gives the lien, it may be enforced in the admiralty.

It is said, however, that the place where these services were performed, was not within the jurisdiction of the admiralty,

The services in this case were performed in the port of New Orleans, and whether this was within the jurisdiction of the court or not, will depend upon the fact, whether the tide in the Mississippi ebbs and flows as high up the river as New Orleans.

This is a question of fact, and it is not undeserving of notice, that although there was a plea to the jurisdiction of the court interposed, the objection was not set up. Had it been put in issue, the evidence would probably have removed all doubt upon that question; not having been set up, it affords an inference that the objection could not have been sustained by proof.

But we think we are authorized judicially to notice the situation of New Orleans, for the purpose of determining whether the tide ebbs and flows as high up the river as that place. In the case of the Apollon, 9 Wheat. 374, it is said by this court, that it has been very justly observed at the bar, that the court is bound to take notice of public facts and geographical positions: and in the case of the steamboat Thomas Jefferson, the libel claimed wages earned on a voyage from Shippingport in the state of Kentucky, up the river Missouri, and back again to the port of departure. And the court say, that the voyage, not only in its commencement and termination, but in all its intermediate progress, was several hundred miles above the ebb and flow of the tide, and, therefore, in no just sense can the wages be considered as earned in a maritime employment. It is fairly to be inferred, that the court judicially noticed the fact, that the tide did not ebb and flow within the range of voyage upon which the services were rendered, as there is no intimation of any evidence before the court to establish the fact.

It cannot certainly be laid down as a universal, or even as a general proposition, that the court can judicially notice matters of fact. Yet it cannot be doubted that there are many facts, particularly with respect to geographical positions, of such public notoriety, and the knowledge of which is to be derived from other sources than parol proof; which the court may judicially notice. Thus in the case of the United States v. La Vengeance, 3 Dall. 297, 1 Peters's Cond. Rep. 132, the court judicially noticed the geographical position of Sandy

Hook. And it may certainly take notice judicially of like notorious facts, as that the bay of New York, for instance, is within the ebb and flow of the tide.

The appellants' counsel has referred the court to Stoddard's Louisiana, 164, for the purpose of showing that the tide does not ebb and flow at New Orleans; but we think it affords a contrary conclusion. The author says, "the tides have little effect upon the water at New Orleans; they sometimes cause it to swell, but never to slacken its current." No distinction has ever been attempted in settling the line between the admiralty and common law jurisdiction, growing out of the greater or less influence of the tide. So far as that admiralty jurisdiction depends upon locality, it is bounded by the ebb and flow of the tide; and if the influence of the tide is at all felt, it must determine the question. No other certain and fixed rule can be adopted: and in determining this, we must look at the ordinary state of the water, uninfluenced by any extraordinary freshets.

The authority of Mr Stoddard goes to show that the tides have some effect upon the water at New Orleans; they cause it to swell, but not so much as to slacken the current. In the case of Rex v. Smith and others, 2 Doug. 441, it became a question whether the sea could properly be said to flow above London bridge. It was contended that the tide beyond that limit was occasioned by the pressure and accumulation backwards of the river water. Lord Mansfield said, a distinction between the case of the tide occasioned by the flux of sea water or by the pressure backwards of the fresh water of a river, seemed entirely new.

We think that although the current in the Mississippi, at New Orleans, may be so strong as not to be turned backwards by the tide; yet if the effect of the tide upon the current is so great as to occasion a regular rise and fall of the water, it may properly be said to be within the ebb and flow of the tide.

It has been argued on the part of the appellant, that the evidence shows that this steamboat was to be employed in navigating waters beyond the ebb and flow of the tide, and therefore not employed in the maritime service. In the case of the steamboat Jefferson, the court said, there is no doubt the juris-

diction exists, although the commencement or termination of the voyage may happen to be at some place beyond the reach of the tide. The material consideration is, whether the service is essentially a maritime service, and to be performed substantially on the sea or on tide water. All the service in the case now before the court was at New Orleans; and the first voyage, at all events, was to commence from that port The objection, therefore, to the jurisdiction of the court cannot be sustained.

2. The second exception is founded on a supposed waiver of any privilege or lien, and that the appellees trusted alone to the personal responsibility of the owners of the steamboat.

To determine this question, it becomes necessary to look at the contracts under which the repairs were made.

The first bears date on the 11th of September 1830, by which certain specified repairs were to be made, for which the appellants stipulated to pay one thousand five hundred dollars. No time is fixed for the payment. The repairs contemplated by this contract were such only as could be made without hauling up the boat. In the progress of the work, however, it was discovered that more repairs were necessary than had been supposed, and which could not be made without hauling up the boat. And on the 19th of October 1830, another contract was entered into, by which the owners agreed to pay four hundred and seventy-five dollars for hauling up the boat, two hundred dollars of which was to be paid in cash, and the balance in one month after the boat shall be launched and set afloat. The boat was then to be repaired under the instruction of Captain Jarreau, the work to be paid for when the account shall be approved by Captain Jarreau. The boat to be repaired and delivered afloat by the 20th of November, ready to receive a cargo; the appellees were to allow twenty-five dollars a day for each day *they retarded* the delivery.

An express contract having been entered into between the parties under which these repairs were made is no waiver of the lien, unless such contract contains stipulations inconsistent with the lien, and from which it may fairly be inferred that a waiver was intended, and the personal responsibility of the party only relied upon. Express contracts are generally made

[Peyroux and other v. Howard and Varion.]

for freight and seamen's wages, but this has never been supposed to operate as a waiver of a lien on the vessel for the same.  There are certainly some of the older authorities which would seem to give countenance to the doctrine that an express contract operated as a waiver of the lien; but whatever may have been the old rule on the subject, it is settled at the present day, that an express contract for a specific sum is not of itself a waiver of the lien, but that to produce that effect, the contract must contain some stipulations inconsistent with the continuance of such lien, or from which a waiver may fairly be inferred.  Hutton v. Bragg, 2 Marshall, 339; 4 Camp. 145, and the cases cited in note.

Applying these rules to the case before us, we can discover nothing (except as to two hundred and seventy-five dollars, the balance for hauling out the boat, which will be noticed hereafter), inconsistent with the right of a lien, or indicating any intention to waive it.  In the first contract no time is fixed for the payment of the one thousand five hundred dollars; it became payable, therefore, as soon as the work was completed. And the repairs under the second contract were to be paid for as soon as the account was approved by Captain Jarreau. There is nothing, therefore, from which it can be inferred that any time of credit was to be allowed.  The balance of two hundred and seventy-five dollars, for hauling out the steamboat, stands upon a footing a little different.  That was to be paid in one month after the boat was launched and set afloat. A credit was here given; and a credit too beyond the time when, in all probability, the boat would have left the port of New Orleans; for it can hardly be supposed that it would have taken thirty days to load her.  And by the Civil Code of Louisiana, Art. 2748, the privilege ceases if the ship or boat is allowed to depart without exercising the right.

As to this sum, therefore, the decree is erroneous.

3. The principal ground of complaint under the third point made at the bar is, that the appellants have been made to pay twice for some part of the work.  That is, that part of the work which was to be done under the first contract, and for which they were to pay one thousand five hundred dollars, has

[Peyroux and others v. Howard and Varion.]

been charged under the second contract. There is certainly some confusion growing out of the manner in which this work was carried on under the different contracts. The work which was to be performed under the first, was not completed when the second was entered into, and both being carried on at the same time, might very easily occasion some mistake. And in addition to this, there was, under the first contract, some extra work to be done and paid for over and above the stipulated sum of one thousand five hundred dollars, which rendered it still more difficult to keep the accounts for materials and labour under the different contracts, separate and distinct. The evidence was taken in writing out of court, and no opportunity afforded for explanation upon these points. The district judge, feeling the difficulties growing out of these circumstances, ordered Wilson, one of the witnesses whose deposition had been taken and read in evidence, to appear and answer in open court. He was the clerk of the appellees, who had kept an account of the timber used and work performed; and on his examination he swore that all the charges and items for work done, in the account of the libellants, were over and above the work done under the first contract for one thousand five hundred dollars. That the libellants had hands at work at the repairs under the contract and the extra work at the same time. That there is not a day's work nor a foot of plank charged in the account which was to be done under the first contract. This testimony leaves no reasonable doubt of the correctness of the account. By the second contract, payment was to be made when the account was approved by Captain Jarreau; no formal approval appears to have been made. But he was a part owner, and superintended the repairs; and one of the witnesses says he was present when the account was presented to Captain Jarreau, who said he was not surprised at it, because there was a great deal more work than he had any idea of; and that he did not think at first that she required so much. This, although not a direct, was an implied approval of the account.

The delay in not delivering the boat to the appellants by the time specified in the contract, was occasioned by her unexpected state and condition, and the extent of repairs required.

[Peyroux and others v. Howard and Varion.]

And besides the delivery at the time mentioned in the contract, was dispensed with by captain Jerreau.

Upon the whole, we are of opinion, that the decree of the district court, as to the two hundred and seventy-five dollars, ~st be reversed, and in all other respects affirmed.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the eastern district of Louisiana, and was argued by counsel: on consideration whereof, it is the opinion of this court that the decree of the said district court as to the two hundred and seventy-five dollars is erroneous and should be reversed, and that in all other respects the said decree should be affirmed: whereupon, it is ordered, adjudged and decreed by this court, that the decree of the said district court in this cause, as to the balance of two hundred and seventy-five dollars for hauling out the steamboat, be, and the same is hereby reversed, and that the said decree in all other respects be, and the same is hereby affirmed; and it is further ordered, that each party pay his own costs in this court.