Spear, J.
Being requested to separately state its finding of fact and conclusions of law, the circuit .court after finding that the plaintiff was the owner of the premises described in the petition in such sense as to authorize him to maintain the action, proceeded:
‘•'■Third —Said premises are on the west side of the Cuyahoga river, and plaintiff’s title in the land in the bed of the Cuyahoa river extends to the center thereof.
“Fourth — The Cuyahoga river passes through the city of Cleveland, Cuyahoga county, Ohio, and forms a part of what is known as the harbor of Cleveland, and empties into Lake Erie, and is navigable at the place it flows by said premises, and for a long distance up and down stream, and is used by vessels of all kinds navigating the great lakes and tributary waters.
“Fifth — Pollock’s property is unimproved, having no dock or wharf thereon, and neither at the time of the commencement of this action nor since, nor at the present time, is said Pollock making any use of his property.
“Sixth — The defendant owns over seven hundred feet of land along the river, contiguous to the property of the plaintiff and north thereof, and said defendant’s said property has a dock along the whole front upon the said river, and its property has, since 1887, been used for the purpose of building and repairing vessels of all kinds:
“Seventh — The defendant has erected on its own property, within a few feet of the boundary line between its property and the plaintiff’s a derrick, for the purpose of lifting steam boilers and machinery upon vessels which it is engaged in building and repairing, and has also sometimes *664 used, said derrick for hoisting machinery into vessels for transportation.
“Eighth — The derrick is so located, that when defendant makes use of its derrick for the purpose aforesaid, vessels must lie in the river outside of the established dock line, in front of defendant’s property and extending in front of the river bank of plaintiff, for a distance of twenty-five to seventy-five feet, and on the west side of the center line of the said river.
“Ninth — -That when said vessels are so moored as to permit defendant to use its derrick, it has at times carried lines from the portion of said vessel immediately in front of plaintiff’s river bank, across the water and across a small portion of the river bank of plaintiff, and tied them to posts or piles driven upon defendant’s land.
“Tenth — That at the time this suit was brought a vessel was lying in the manner hereinbefore stated, and continued there for some time thereafter, and various vessels and steamboats have, by the defendant, been placed there since the commencement of this action and the defendant intends to continue, when required by its business, to make use of its derrick in the manner indicated, and to cause and permit steamboats and other water craft to lie in the river over-lapping plaintiff’s water front as hereinbefore found, and to cause and permit lines to be fastened in the manner above stated, to steamboats and other water craft while being repaired, and that it has in its shipbuilding yard today, two vessels, one of which it will launch at a very early date, and another of which it will launch in a few month’s time, into which it proposes to put engines and other machinery by using the derrick above mentioned, and *665 for that purpose, proposes to float and tie theboats in the way indicated.
“Eleventh — Plaintiff has repeatedly notified defendant to cease tying the boats in the manner above indicated, and notified defendant not to put boats in front of his property in the Cuyahoga river, which notice the defendant has not, and does not propose to observe, so long as no other use is made of plaintiff’s said premises than has heretofore been made.
“ Twelfth — The plaintiff has not suffered any damage by reason of the acts of the defendant.
“The court finds as follows, as conclusions of law: That a court of equity will not restrain or limit the use of a navigable river by the owners of land upon its banks, engaged in carrying on a legitimate business, upon the petition of a private person who has not suffered special damage, other than that sustained by the general public.
“Wherefore, the petition for injunction herein is dismissed at the plaintiff’s costs, and it is considered and adjudged that said defendant recover of said plaintiff its costs herein.”
The inquiry presents two questions: 1. Were the acts of the company in mooring vessels in front of plaintiff’s land for the purpose of repairs to old vessels and of putting in boilers, engines and machinery in new vessels, trespasses? 2. Were its acts in carrying lines across the river bank of plaintiff, trespasses for which injunction will lie?
The right of ownership to the center of the stream by one owning land abutting on a navigable river, is not in dispute. It was declared by this court in Gavit v. Chambers, 3 Ohio, 497, that: “He who owns the lands upon both banks, owns the entire river, subject only to the easement of *666 navigation, and he who owns the land upon one bank only, owns to the middle of the river, subject to this same easement.”
And this principle has. been reaffirmed in Walker v. Public Works, 16 Ohio, 544, in June v. Purcell, 36 Ohio St., 405, and in many other cases. This does not, however, mean that the ownership is an unqualified one, for it is universally conceded that the water of a stream is not the subject of ownership in the ordinary sense. As expressed in Lancy v. Clifford, 54 Me., 487: “The right of property is in the right to use its flow, and not in the specific water.” That is, it is but a usufructory right, a right to enjoy that which belongs to another, and to draw from it all the advantage it will produce without wasting its substance. That other, as to the water of a navigable stream, is the public, for, in Ohio, it -is established law, that navigable rivers are public highways. As tersely put by Birchard, C. J., in Walker v. Public Works, supra: “The right of the adjacent proprietor to the water of the stream, is a usufructory right, appurtenant to the freehold, not an absolute property.” Adding that he may use the water “in any way not inconsistent with the public easement, or of private rights.” This limitation is recognized when it is declared, as by Mr. Justice Gray, in Prosser v. R’d. Co., 152 U. S., 59, that “there can be no doubt that a state may, by its legislature, or through a board of harbor commissioners, establish, for the protection of commerce and navigation ■ harbor lines, in navigable waters, not inconsistent with any legislation of congress, limiting the building of wharves and other structures upon lands not already built upon.” And the right is enforced in this state by chapter 14, title *667 12, of the Revised Statutes, which authorizes municipal councils to establish dock lines and regulate the use of the same within corporate limits. The principle clearly deducible is, that as to navigable rivers, the private right of the riparian owner to the land, ordinarily covered by water, is in all cases subordinate to the paramount public right of navigation, and its incidents. The converse is expressed by Christiancy, J., in Rice v. Rudiman, 10 Mich,, 125, thus: “In other words, all the private or individual use and enjoyment of which the land is susceptible, subordinate to, ana consistent with, the public right, belong to the riparian owner as against any other person seeking to appropriate it to his individual use.”
We now inquire: Was the mooring of boats by the company in the part of the water of the river which is over plaintiff’s land, for the purpose of repairing or completing such vessels, the pursuit of a strictly private manufacturing business thereon, as is’ claimed by plaintiff? Or, was it but an incident of navigation and commerce, as claimed by defendant? If the latter, the judgment of the circuit court is rigid in this particular, and as to this should be affirmed; if the former, the judgment is wrong and should be reversed, for whatever may be the rule elsewhere, in Ohio it is established that repeated acts of trespass which in time would ripen into a prescriptive right, although the damage for each trespass is but nominal, will entitle the aggrieved party to an injune- • tion. And it seems to be also established that the owner of the fee of a highway may have trespass founded upon his possession, against a stranger, for any acts of trespass committed upon it, not justified or excused under the public right, and if he *668 neglects to sue, but submits, adverse possession under claim of right would in time ripen into a prescriptive right. Having the exclusive seizin and possession of the soil of the highway, subject only to the easement of the public, he may lose his right of seizin and possession by being deprived and barred by the statute of limitations. Tootle v. Clifton, 22 Ohio St., 247; Washburn on E. & S. 10; Reed v. Leeds, 19 Conn., 182.
This brings us to the inquiry as to what is fairly embraced within the meaning of the term, “easement of navigation.” One dictionary meaning of navigation is “the science or act of conducting a ship from one place to another,” and this definition is quoted by plaintiff’s counsel as applying here. Another definition is: “The science or art of ascertaining the position and directing the course of vessels, especially at sea by astronomical observations or calculations; nautical science or art.” Still another is, “shipping,” which would embrace, the conduct of ships generally. Clearly the term “easement of navigation,” should not be construed in any narrow, scientific sense, but, having in. mind that the reservation of the easement by the state is for the benefit of the public in its use of the highway, should receive a construction in harmony with the nature of the uses of the water by the public, and the objects of a public nature to be accomplished by such uses. Those objects relate to trade and commerce, which is the interchange of goods or products between nations or individuals by means of transportation; or, as applied to commerce on the water, by means of navigation. ‘ ‘Commerce, ’ ’ says Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat, 1, “is traffic, but it is something more; it is inter *669 course.” Commerce, then, is the object; navigation the instrument or incident. In other words, navigation is the means by which commerce is accomplished, and it is for the purpose of aiding commerce that navigation is encouraged and protected. When the-term “easement of navigation” is used, therefore, it carries with it the idea of navigation for the purposes above expressed; so that, whatever relates to commerce, or is incident to it, is embraced in the term. This enlarged meaning is implied in the language of McIlvaine, J., in State v. Shannon, 36 Ohio St., 423, where he observes: “True, navigable streams, in this state, are declared to be public highways; but the right to use a public highway is not abridged by protecting the owner of the fee in the exclusive right of killing game therein. Travel and commerce are not thereby hindered.” And has entered into the structure of our navigation laws, whereby regulations are established defining the nationality of ships, the privileges to which they have claim, as well as generally the conditions regulating their movements. To confine the easement to the mere conducting of ships from one place to another, would materially limit the beneficial right of the public. This brings within the scope of the easement the vessels themselves, for, as said by Mr. Justice Clifford, in Sweatt v. R'd. Co., 3 Cliff., 339. “The word commerce includes navigation as well as traffic, and the power to regulate extends to the vehicles of intercourse as well as to the commodities to be exchanged.” And by Mr. Justice Fields, in Steamship Co. v. Commissioners, 18 Fed., 11: “It (commerce) embraces navigation, and extends to all the instruments used in navigating inland waters and the ocean.”
*670 So that, control over commerce implies control, in a general sense, over the means and vehicles by which it is accomplished, and necessarily the privileges of commerce extend to such vehicles. Coming to the matter of repairs, we find that the contract for work and material so employed, is a maritime contract. The St. Lawrence, 1 Black, 522; Peyroux v. Howard, 7 Pet., 324. Vessels cannot be operated or moved without getting out of repair, and hence stopping for repairs becomes one of the incidents of their use. It would not be reasonable, from the stand-point either of expense or convenience, to compel such vessels to seek a slip or a dry dock on every occasion when repairs are needed, at least, when such repairs can be made without interference with other craft plying the same waters, and without injury to riparian owners. It follows from the foregoing, that the use made by defendant of the waters of Cuyahoga river, for the repair of vessels, was an incident to the right of navigation and commerce, and hence a public use, and a proper use.
The question of the right to moor vessels in front of plaintiff’s property, outside the dock line, while the machinery was being put in, presents greater difficulties. The point is thought to turn upon whether or not an independent contract for putting in such machinery would be a maritime contract. “A ship,” says Mr. Benedict, in his work on Admiralty, section 215, “is a locomotive machine adapted to transportation over rivers, seas and oceans.” In this sense, the vessels moored by defendant, awaiting engines and boilers, were ships. They were machines upon the water, would float, and were capable of being-moved and propelled on the water, and were so *671 floating on the water, and intended as aid to commerce. The same author, (section 213), observes: “It is believed that a sure guide, in matters of contract, is to be found in the relation which the cause of action has to a ship, the great agent of maritime enterprise, and to the seas as a highway of commerce. Where there is navigable water, and ships and vessels, there are the subjects of maritime law.” This author is of opinion that* by the general maritime law of the world, a contract to build a ship is a maritime contract. On the other hand, the Supreme Court of the United States, in Ferryboat v. Beers, 20 How., 393, and in Roach v. Chapman, 22 How., 129, has held that a contract to build a ship is not a maritime one. But these cases related to construction while upon the land. In the former case, (which is the authority for the holding in the latter), it is observed that: “The contract is simply for building the hull of a ship, and delivering it on the water. * * * So far from the contract being purely maritime, and touching rights and duties pertaining to navigation (on the ocean or elsewhere), it was a contract made on land, tobe performed on land.” These cases could hardly be accepted as authority for the proposition, that a contract to supply engine and boilers for a vessel already launched, and awaiting only the putting in of the propelling power, was not a maritime contract in the sense that identifies such contract with navigation and commerce. A late case, The Eliza Ladd, 3 Sawy., 520 (U. S. D. C.,) bears directly upon the point. The claim of the libellant was, to enforce his lien for engine, boilers and machinery, put in after the vessel was launched. After reviewing the foregoing and other authorities, the court remarks: “And yet a *672 contract to build a steam ferry or tug boat outright would not be, under the decisions cited, a maritime contract. My own impression is, that any contract made to equip, fit or furnish, a vessel after she is launched and afloat, is a maritime contract. It is not, in the language of 20 Howard, supra, ‘a contract made on land, to be performed on land,’ but. one made with reference to a ship already in existence and floating upon the elements for which she was originally designed. Such a contract is to be performed on water as much as an ordinary contract of affreightment or repairs.” And speaking of the construction of a ship: “Separate pieces of timber or iron, or both, being put together in a certain form, so as to float upon the water and transport or bear up freight or passengers, may become a ship. At what a point of time is this change accomplished? I am inclined to think that the correct answer to this question is suggested in the brief of the libellant, and that it is ‘at the moment when she leaves the ways, and her keel strikes the element for which she was originally designed. ’ That is the moment of her birth as a ship, and the occasion when a name is usually bestowed upon her. Thereafter all contracts to equip, furnish or repair this machine have direct reference to a vessel in esse, with a eapaeitv for locomotion and transportation on navigable waters, and are, therefore, maritime. ” * * * “It seems safe to say, that a contract made after a vessel is launched and afloat, to furnish her with particular means of propulsion, as sails, or steam paddles, or to change the mode of her propulsion, is a maritime contract. Certainly it is not a contract to be performed on land; neither is *673 it a contract to build any more than any contract for repairs.”
Many authorities cited at the argument have been examined, which we do not deem it necessary to refer to. They are not in entire harmony. Those readers who care to pursue the subject in extenso, will find the cases cited in the briefs,* and will find themselves well repaid by a persual'of the able and interesting arguments of the respective counsel.
Without taking space for general discussion, our conclusion is, that the work of placing engine and boilers to the vessels of the defendant, as they lay moored partly in front of plaintiff’s land, whether done by an independent contractor, or by the defendant itself, was a maritime purpose, an incident to navigation and commerce which the defendant, as one of the public, had the right to pursue in the legitimate use of the highway, so long as such use did not unreasonably impede navigation. The mooring of vessel^ there, though they did overlap in front of plaintiff’s land, did not constitute trespasses, and the plaintiff, under the facts found, has no standing in a court of equity to enjoin such use. There was, therefore, no error in the refusal of the circuit court to allow an injunction as to this, the main branch of the case.
2. The carrying of lines across the river bank of plaintiff, presents a wholly different question Those acts invaded the real property of plaintiff the title to which is not qualified by any right in the public; it is absolute. It was the judgment of the circuit court that such acts resulted in no real damage to plaintiff, and that bv reason of the record in this case, their repetition, no matter for *674 what duration, of time, could not ripen into a right by prescription, and hence plaintiff was not entitled to any relief.
We are unable to agree with this conclusion. The acts complained of were trespasses. It is by no means clear, that they would not, if pursued long’ enough, grow into a prescriptive right. It isn’t necessary to ascertain this with positiveness. It is enough that if there be any doubt, the risk should not be imposed upon the plaintiff. And it is no. hardship upon defendant to say that if it needs to use plaintiff’s land it can do as other people do in like circumstances — obtain a right to such use by negotiation. The very fact that the trespasses are in themselves trifling, and the damage, if any, so small that suits at law to recover would be impracticable, affords an additional reason for granting an injunction.
As to this ground of complaint the judgment of the circuit court will be reversed, and judgment entered for plaintiff in error.
Judgment reversed.