No. 1,282.

J. W. BRUMAGIM, Administrator of the Estate of ROBERT DYSON, deceased,
RESPONDENT, *v.* T. T. BRADSHAW, GEO. B. RICH AND J. C. PINK-
HAM, APPELLANTS.

STATEMENT ON MOTION FOR A NEW TRIAL.—If the statement on motion for a
new trial fails to specify wherein the evidence was insufficient to justify the
verdict, the appellate Court is precluded, by the statute, from all inquiry upon
that subject, notwithstanding the statement purports to contain all the evidence
given on the trial.

IDEM.—The allegation in the statement, on a motion for a new trial, that the
verdict is against law, is not sustained by showing that it is not justified by the
evidence.

LICENSE.—One who enters into the possession of land, under a license from an-
other, holds the same, in subordination to the title of the other, whether he pays
rent or not.

REJECTING OFFERED TESTIMONY.—There is no error in rejecting testimony which
in no way can be of benefit to the party who seeks to introduce it.

DISCRETION OF THE COURT ON THE EXAMINATION OF A WITNESS.—There is no
abuse of the discretion of the Court in refusing to permit a witness, on re-exam-
ination, to be further interrogated on a point, concerning which he had already
fully testified.

JUDICIAL NOTICE.—The Court will take judicial notice, that the " Potrero," in
the year 1850, was separated from the City of San Francisco, as it then was, by
Mission creek, and that it is now a portion of the City of San Francisco, divided
in lots, blocks and streets.

Statement of Facts.

INSTRUCTIONS BY THE COURT—Must be construed in reference to the proof.

INCLOSURE OF A TRACT OF LAND.—A beach, upon tide water, may constitute a portion of the inclosure of a tract of land.

LAND BOUNDED BY A MARSH.—There is nothing in the nature of a marsh to render it impossible for it to constitute a well defined boundary of a tract of land.

POSSESSIO PEDIS, OR ACTUAL POSSESSION OF LAND.—The acts of ownership and dominion over land, which may be sufficient to constitute an actual possession, vary according to the condition, size and locality of the tract.

IDEM.—The whole theory of a *possessio pedis*, rests upon the assumption that the acts of dominion which establish it, are such open, notorious acts of ownership, as usually accompany the possession of real property, and naturally spring from a claim of exclusive dominion.

IDEM.—Actual possession of land can only be taken by such open, unequivocal and notorious acts of dominion, as plainly indicate to the public that he who performs them has appropriated the land, and claims the exclusive dominion over it.

IDEM.—A substantial, artificial inclosure, erected around the entire tract, is such an act of dominion, and is held to be, of itself, sufficient to constitute actual possession.

IDEM.—NATURAL AND ARTIFICAL INCLOSURE.—An inclosure, partly by natural and partly by artificial barriers, will, under certain circumstances, likewise establish an actual possession; but it does not follow that every such inclosure establishes an actual possession, as a conclusion of law.

IDEM.—When an inclosure by such barriers is relied upon as establishing the actual possession, it is the province of the jury, upon all the proofs, and considering the quantity, locality and character of the land, to decide whether or not the artificial barriers were sufficient to notify the public that the land was appropriated, and to impart to the claim of appropriation the characteristic notoriety and *indicia* of ownership.

IDEM.—CHARGE OF THE COURT.—It is error for the Court, in its instructions to the jury, to assume, as a conclusion of law, that a substantial inclosure, partly natural and partly artificial, necessarily established the actual possession of the tract of land.

APPEAL from the District Court of the Seventh District, Marin County.

This action was originally brought by Robert Dyson in the District Court of the Fourth District, City and County of San Francisco, from which it was transferred to the District Court for the Fifteenth District, and from that it was transferred to the District Court for Marin County. Robert Dyson having died pending the action, J. W. Brumagim, administrator of his estate, was duly substituted as plaintiff in his stead.

The following are the instructions asked for, at the trial,

on behalf of the defendants, to which reference is made in the opinion:

"*First*—Plaintiff, to recover by virtue of a prior possession, must prove, to the satisfaction of the jury, that such prior possession gave to the plaintiff, or his grantor, the exclusive control of the premises; that plaintiff, or his grantor, had exclusive possession and control, and that a mere scrambling possession, conjointly with others holding adversely, is not sufficient."

Which was given by the Court, with this qualification:

"But, if the plaintiff, or those under whom he claimed, ever acquired the full and complete possession of the premises by a substantial inclosure, and use for pasturage purposes (the land being suitable for such purposes), the fact that any number of persons trespassed upon the possession so acquired against the will of the plaintiff, or those under whom he claimed, will constitute no defense."

"*Second*—That, while exclusive prior possession is evidence of title in fee, if that possession is believed by the jury, to have been derived from or under parties admitted by the possessors to be the owners, no such presumption of title arises.

"*Third*—That prior possession, derived by the possessors, directly or indirectly, from parties admitted by them, or those under whom they enter, to be the owners in fee, for a temporary purpose, is not sufficient to maintain ejectment."

The Court refused to give the second and third instruction in charge to the jury.

The other facts in the case, upon which the decision turns, are given in the opinion of the Court.

*Crittendon & Wilson, Campbell, Fox & Campbell, Thomson Campbell, John Currey,* and *Henry Highton,* for Appellants:

The position of respondent's counsel is, that the appellants cannot rely upon the ground that the evidence was insufficient to justify the verdict, because *we have not specified the particulars in which it is insufficient*; and the decisions of this Court, which are referred to, go thus far and no farther.

not of fact. Either error is equally injurious to a party, and the law intends, by this provision, to give a remedy for either. It says so explicitly. Language could not be plainer. It is a palpable reference to and adoption of the distinction well recognized between law and fact in all judicial proceedings.

In the case of a special verdict, the jury find the fact only, and the Court declares the law. But, in the case of a general verdict, by what course of investigation can a Court separate the conclusion of law and fact, and say in respect to which of them there was error?

There is but one mode conceivable. It is to consider the whole of the evidence before the jury and draw that conclusion of fact from it, which, in the judgment of the Court, the jury would have been bound to draw, and then determine whether the law, applied to that fact, justified the conclusion of the jury.

By such an investigation, the Court reaches the same conclusion as is arrived at by the action of Court and jury, each in its proper sphere, when there is a judgment founded upon a special verdict.

Where the objection is that the verdict is against the law, and the Judge is examining the evidence, with a view to determine what conclusion of fact the jury were warranted in arriving at, in order that he may then say, in applying the law to the fact so ascertained, whether the verdict was against or supported by law, he is but exercising the same power, and discharging the same duty, as when he passes upon the evidence under an objection that it did not justify the conclusion of fact.

The same rules must govern him in each case. He is not lightly to set aside a verdict as against evidence; but, if clearly so in his judgment, he must do it. And he is not lightly to set aside a verdict as against law; but if, in his judgment, the evidence clearly warranted but one conclusion of fact, and the law applied to that conclusion does not warrant the verdict, he must set it aside.

And this Court, in reviewing the action of the Court below, must naturally be governed by the same considera-

We admit the proposition. We have never intended to controvert it. We may regret that in the preparation of the case this ground of objection to the verdict was not reserved. But, fortunately for the rights of our clients, and, we must say, for the cause of justice, the failure to reserve it did not have the effect to close the door upon all inquiry as to the real merits of the controversy.

In strict compliance with the requirements of the statute, the defendants, in the notice of their motion, designated, generally, amongst the other grounds on which the motion would be made, *that the verdict was against law*, and they set forth in the statement all the evidence in order that, upon the case made by the whole of it, the Court might pass upon the question.

The statute makes this a cause for the granting of a new trial. It is a distinct ground of a motion for that purpose. It is none the less a distinct ground, because of the mere circumstance that it is found in the same subdivision of the section with that other ground of motion, the insufficiency of the evidence to justify the verdict. The two are stated in the disjunctive. They are alternatives. Either may be taken. They are objections of an entirely different order. They involve wholly dissimilar elements. To consider and determine upon either, may require a review of the very same evidence, but it is for a different purpose. When we say the evidence did not justify the verdict, we mean that the evidence did not justify the jury in coming to a particular conclusion of fact; that the weight of evidence was the other way, and that the jury should have come to a contrary conclusion of fact. When we say the verdict was against law, we mean that, conceding the fact to be as established by the successful party, or as the jury were warranted in concluding it to be, still, applying the law to the fact, the verdict should have been the other way.

The verdict is a conclusion of law and fact intermixed. The jury are the judges of the fact, the Court of the law. But, in rendering a general verdict, the jury, supposed to take the law from the Court, may misapply it, and thus the verdict may, in reality, be the result of an error of law, and

tions and rules in either case. It will not reverse the order of the Court below in granting or refusing a new trial, unless it be perfectly clear that there was error. It will not set aside a verdict when there was conflicting evidence, or unless there was a very great preponderance of evidence against the verdict. So, when the motion is on the ground that the verdict was against law, and this Court must, of necessity, look into the evidence in order to know what conclusion of fact the jury must have arrived at, that the law may be applied to that fact, this Court will consider every fact to be determined in a way to support the verdict, where there is any conflict of evidence, or where there is not a very great preponderance of evidence against it.

Some of the learned counsel on the other side seem to be a little confused on this subject. Most of them are content with the mere assertion that we have discussed the facts of the case when we had no right to do so, having made no specification of particulars in which the evidence did not justify the verdict, and having, therefore, acquiesced in the verdict. They fail to perceive that we have the right to attack the verdict in two ways, and that while we may have acquiesced in the facts determined in the verdict, it by no means follows that we have acquiesced in the law of the verdict.

Shores of the bay are public, and are not liable to be appropriated by individuals for private purposes, or to be converted into impassable boundary lines for the inclosures of property, except by express grant from the State. (*Pollard's Lessee* v. *Hagan et al.* 3 How. 230; *Blundell* v. *Catterall*, 5 B. & Ald. 268; *Polack* v. *McGrath*, 32 Cal. 21.)

Nor can a marsh be used to form a boundary of land, or constitute a part of an inclosure.

"Inclosure" involves the idea of separation of the thing inclosed from that which adjoins and surrounds it, and it can only be effected by natural or artificial objects, forming a continuous line, and of such a kind as to constitute an obstacle in the way of passing into and out of the inclosure.

Even if the bay or the creeks, so far as the Potrero abutted directly upon them, could be held to constitute

such an obstacle, which we submit could not be the case, because the shore is open to the public, and anyone may lawfully land upon and use it, what can be said of those other portions of the line of alleged inclosure where it is admitted, that, outside of the Potrero, and between it and the bay, there lies a belt of land, the property of another, with no obstacle, natural or artificial, between the two?

*Elisha Cook, Alex. Campbell, Jr., J. P. Hoge, Theodore Hittell,* and *McAllister & Bergin,* for Respondent:

In the various petitions and briefs lately filed in this cause, the subject of the insufficiency of the evidence to justify the verdict has been elaborately argued, without stating any distinct ground upon which it was done, as though the case stood upon appeal from an order of the Court denying motion for a new trial, on the ground of the insufficiency of the evidence. Nor were we advised of the principle or rule invoked in support of this line of argument, until it was disclosed in the able briefs for appellants last filed. If we correctly apprehend the position there taken upon the point, the argument is this: True, we have not moved for a new trial on the ground of the insufficiency of the evidence to justify the verdict—it was unnecessary. For the purposes of the argument, we concede the truth of the evidence; but, as a question of law, we insist it fails to disclose a right to recover in the respondent. Thus, though no motion was made for a new trial on the ground of the insufficiency of the evidence to justify the verdict, we are still at liberty to argue it as a question of law.

This, we respectfully submit, is wholly inadmissible. The statute defines a new trial as a re-examination of an issue of fact in the same Court, after a trial and decision by a jury, Court or referee, and enumerates the various grounds upon which it may be granted. Among the other grounds for which a new trial may be granted, are: "Insufficiency of the evidence to justify the verdict or decision, or that it is against law." The party intending to move for a new trial must give notice thereof within a prescribed time. This

notice must designate, generally, the grounds upon which the motion will be made. Within the time allowed thereafter, he must prepare and file with the Clerk of the Court the affidavit or statement upon which the motion is to be heard, and if notice be not filed within time, the right to move for a new trial shall be deemed waived. When the notice designates as the ground upon which the motion will be made the *insufficiency of the evidence* to justify the verdict or other decision, *the statement shall specify the particulars in which the evidence is alleged to be insufficient.* When the notice designates as the ground of the motion errors in law occurring at the trial, and excepted to by the moving party, the statement *shall specify the particular errors* upon which the party will rely. If no such specification be made, the statement *shall be disregarded.* The statement shall contain so much of the evidence, or reference thereto, as may be necessary *to explain the particular points thus specified, and no more.* Thus, the statute is peremptory that the evidence shall be strictly confined to the particular errors assigned in the statement as the ground upon which a motion for a new trial will be made. The reason and propriety of thus restricting it are obvious — to relieve Courts and litigants of unnecessary labor and expense, and apprise them of the real points in issue. The Court is entitled to distinctly know in what particular it has erred, and the adverse party the particular facts upon which the alleged error is claimed to arise. Hence, in preparing the statement, the Court and the parties are entirely guided by the specification of errors upon which the moving party relies, and insert therein only such evidence as is pertinent to explain those errors. Clearly, therefore, if, after having prepared a statement in accordance with the provisions of the Practice Act, containing only such evidence as is necessary to explain the errors specified, the moving party may omit to state insufficiency of the evidence as one of the grounds upon which he will demand a new trial, and not in any manner indicate to the Court or the adverse party wherein the evidence is claimed to be insufficient, both the Court and the adverse party may be readily surprised into apparent error, for which there is

no foundation in fact. Failure to specify insufficiency of the evidence to justify the verdict, is and must be deemed an acquiescence in its sufficiency; and the party thus acquiescing is forever thereafter precluded from raising the question. Such has been the received and uniform construction of the provisions of the Practice Act on this point. (*Harper* v. *Minor,* 27 Cal. 110; *Hidden* v. *Jordan,* 28 Cal. 311; *Hutton* v. *Reed,* 25 Cal. 483; *Walls* v. *Preston,* 25 Cal. 61; *Allen* v. *Fennon,* 27 Cal. 69; *Burnett* v. *Pacheco,* 27 Cal. 410; *Partridge* v. *San Francisco,* 27 Cal. 415; *Butterfield* v. *Central Pacific Railroad,* 37 Cal. 381.)

Motion for a new trial upon insufficiency of the evidence to justify the verdict, like a motion for a nonsuit, proceeds upon the implied admission of the truth of *all* of the evidence adduced, and the one no more than the other can be based only upon a portion of the evidence. It is obvious, therefore, that the insufficiency of the evidence to justify the verdict, cannot be made a question of law, to be raised for the first time in this Court, except upon a statement properly and expressly prepared for that purpose, without gross injustice to the respondent, an utter disregard of the carefully devised safeguards of the Practice Act and overruling all the previous decisions of this Court on the question. A party may, undoubtedly, move to set aside a verdict, and for a new trial, on the ground that it is against law; but it must be because the verdict is against law, upon some ground other than the mere insufficiency of the evidence. Any other construction does violence alike to the letter and the spirit of the statute.

Nor can the admission in the transcript, that "this was all the testimony given in the case," aid appellants, for it relates only to all the testimony given in the case, necessary or pertinent to explain the errors assigned. The record itself conclusively shows that this is all the admission was intended to embrace. A statement that the plaintiff gave evidence *tending* to establish a proposition, is not a statement of the evidence itself, nor can a Court of review determine therefrom the character or weight of such testimony.

Upon the alleged errors in the rulings on the admission of

testimony, the following authorities were cited : *De Witt* v. *Barley* (5 Seld. 375) ; *Kohler* v. *Wells, Fargo & Co.* (26 Cal. 613) ; *The People* v. *Bagnell* (31 Cal. 412) ; *Brook* v. *Crosby* (22 Cal. 50.)

CROCKETT, J., delivered the opinion of the Court :

Since a rehearing was granted in this case, we have been furnished with able and elaborate briefs by the respective counsel, and have carefully reviewed the propositions of law presented on the appeal.

The notice of motion for a new trial, specifies, as one of the grounds, the insufficiency of the evidence to justify the verdict, and, as a separate ground, that the verdict is against law. The statement, in support of the motion, fails to specify the particulars wherein the evidence was insufficient to justify the verdict as required by Section 195 of the Practice Act, which provides "that, if no such specification be made, the statement shall be disregarded." But the statement purports to contain all the evidence given on the trial ; and the counsel for the appellants insists, with much earnestness, that if it clearly appears, from all the evidence, that the verdict ought to have been for the defendants, then the verdict is against law and ought to be set aside on that ground, notwithstanding the omission to specify in the statement the particulars wherein the evidence was insufficient to support the verdict. But the argument in support of this proposition, however plausible, is based on a misconception of the true intent of this provision of the Practice Act. Prior to the adoption of this provision, it was sufficient for the moving party to allege, in general terms, in his notice of motion, that the evidence was insufficient to justify the verdict, without specifying any particulars wherein it was insufficient. The practical result was, that the adverse party had no notice of the particular ground on which the verdict was to be assailed in this respect. He came to the argument of the motion in utter ignorance of the points on which his

adversary would rely in respect to the insufficiency of the evidence. If the evidence was voluminous, and the questions at issue perplexing and difficult of solution, he was placed at a great disadvantage on the argument of the motion, for want of an opportunity for previous preparation in collating the evidence and showing its force and effect, as applied to the questions in issue. It was to prevent this surprise that Section 195 was amended, so as to require the moving party, who relied on the insufficiency of the evidence as a ground of his motion, to specify in his statement the particulars wherein it was insufficient, on pain of having his statement disregarded by the Court. In this case there was no such specification; and we are bound by the mandate of the statute to disregard so much of the statement as might otherwise have been applicable to this ground of the motion. In other words, we are precluded from inquiring whether the evidence was insufficient to justify the verdict. This provision of the statute would be wholly nugatory, if, notwithstanding the omission to specify any particulars in the statement, we could still look into the evidence, analyze and carefully examine it, in order to ascertain if it was sufficient to support the verdict; and if we found it to be insufficient, that we could then set aside the verdict, not on that ground, but on the other separate ground, that it is against law. This would be an evasion of a plain provision of the statute, and would practically annul it. If we could set aside a verdict as against law, because the whole evidence, fairly construed, failed to sustain it, the same result would follow if there was a failure of proof on any one material point in the case. If the plaintiff in ejectment relied on a paper title, we would, on that theory, be compelled to set aside a verdict in his favor, as against law, if, on reviewing the evidence, we found that he lacked a single link in his chain of title, or that he failed to establish the possession of the defendant, or any other material fact essential to his right of action. If a new trial is sought because the evidence does not support the verdict, it can only be had by assigning, as the ground of the motion, the insufficiency of the evidence, and

pointing out in the statement the particulars in which it is insufficient, as required by the statute.

It is not enough to aver that the verdict is against law, and then offer to support the averment by showing that the verdict is not supported by the evidence, and is, for that reason, "against law." If such a course of proceeding was tolerated, all the other specific grounds for new trial, enumerated in the statute, might, for the same reason, be condensed into the one general ground, that "the verdict is against law;" for, in that general sense, it would be "against law," if there was any valid reason whatsoever for a new trial. But the statute, in authorizing a new trial on the ground that the verdict "is against law," evidently does not intend to include in that phrase all or any of the other several distinct and separate grounds of the motion, which are specified in the Act. Whatever may be the class of cases to which that phrase was intended to apply, it is clear that it has no application to cases falling within either of the other subdivisions, into which the grounds for a new trial are divided by the statute.

For these reasons, this Court has no power to review the evidence in this cause, in order to ascertain whether it supports the verdict. In this respect, the appellants are concluded by the verdict.

On the trial, John Treat, a witness for the defendants, testified, on his examination in chief, in a somewhat rambling and disjointed manner, that in the year 1850 he took possession of the Potrero, by repairing the stone wall across the peninsula; that George Treat paid for the whole or the greater part of the labor and material used in making the repairs, but then had no interest in the scheme for getting possession of the Potrero; but it was understood between them, that George was subsequently to become interested; that he subsequently entered into an agreement with the administrator of De Haro to pay rent for the land, and paid some rent under the agreement; that whilst he was so occupying the land, he allowed some persons to go there to make bricks; that he leased a brick-yard to one Weir. He then proceeds as follows : "My impression is they paid rent; am

not positive. I knew Lawhead and Lubbersmier then had a brick-yard on the premises at that time; I received no rent for that; I presume I received it of other parties; I do not know; my impression is—I am not very confident." The defendants then propounded this question to him: "What reason have you for believing they did?" Which was objected to by the plaintiff. The Court then put this question to the witness: "Do you know whether they paid any rent of your own knowledge?" To which he answered: "I never saw them pay any rent." Q.—"Did you hear them say they paid rent?" A.—"I cannot say I did." And thereupon the Court excluded the question, and the defendants excepted, and rely upon this ruling as error.

There is only one aspect of the case, in which the answer to the question could possibly be material. The plaintiff's cause of action was founded exclusively on his alleged prior possession of the Potrero, which he claimed to have acquired under George Treat. The defense denied this prior possession, either in George Treat or in Dyson, the plaintiff's intestate; and as a circumstance tending to rebut an exclusive possession of or dominion over the property, by either George Treat or Dyson, they proved by the witness, John Treat, that the persons occupying the brick-yards were in possession of portions of the property at the time when it was claimed by the plaintiff to have been in the possession of George Treat or Dyson. But the witness stated it as his impression, that some of these persons paid rent for the premises so occupied by them, which, if true, would prove that they held in subordination to John Treat (and George Treat, if the two were then jointly interested in the property), and, consequently, that their possession and occupation was not hostile, but in subordination to the title or possession of the Treats. In order to test the recollection of the witness, in respect to the payment of rent by the persons using the brick-yards, the defendants propounded the question, which was objected to: "What reason have you for believing they did?" (Pay rent.) We do not perceive how the answer to the question could possibly have benefited the defendants. If the witness, in answer, had stated

satisfactory reasons for his impression, if it did not damage, it clearly could not have aided the defendants. On the other hand, if he had stated the most unsatisfactory, or even absurd reasons for his impression, it would not, materially, have benefited the defendants, inasmuch as he had already testified that the persons occupying the brick-yards (except Lawhead and Lubbersmier, who, he admitted, had never paid rent) entered with his permission and license; and by the mere fact of entering under a license, their occupation and possession was in subordination to the possession of Treat, whether they paid rent or not. It was, therefore, immaterial to ascertain whether or not they paid rent, and the defendants were not prejudiced by the ruling of the Court, even though it be conceded that the answer sought to be elicited from the witness, would have been as favorable to them as the nature of the question would permit.

On the cross-examination of the same witness, he was asked by the plaintiff: ''Did you not turn over all the right you had to that property to George Treat, finally?'' He answers: ''I did, with the exception of the lease that was spoken of already—the piece of land that was rented to Weir, on the Potrero. There were certain portions that were not turned over to him; a piece that there was a brick-yard on. I turned over all, except those who held under a lease from me—that is, he would have the same rights that I was to have. I turned over all to him, except those to whom I had leased the same rights that I had. I think that arrangement was consummated in the latter part of 1851. I am not positive whether the transfer was made then to George Treat or Dyson.''

On re-examination, by the defendants, he testified: ''I turned over such rights as I had,—the right to pasture cattle there; and, also, I had certain rights to use the soil.'' The defendants proceed as follows: '' You said that you turned over the possession to George Treat, and that he was to have the same rights that you had?'' The witness answers: ''I do not know, positively, whether I turned it over to Treat or Dyson; they were both acting; Dyson, I think, was acting for Treat.''

The defendants' counsel then propounded the following question : "I now repeat the question, What rights were those you turned over? that fact having been drawn out on the cross-examination ;" but the question was excluded by the Court, on the objection of the plaintiff, and this ruling is relied upon as error.

The Court, in our opinion, was fully justified in excluding the question, on the ground that it had already been fully answered, and no good could result from a repetition of the previous testimony. The *Nisi Prius* Court must necessarily exercise a sound discretion in respect to the latitude to be allowed in sifting the testimony of a witness, by a rigid and often prolix examination.

In the cross-examination of an adverse witness, who betrays an evident bias for the party calling him, or, on the examination in chief, of a reluctant witness, called by the party himself, the Court should exercise a sound discretion in properly relaxing the rule, so as to promote the ends of justice ; but, in this instance, we see no reason to believe that the Court abused its discretion in refusing to permit the witness, on re-examination by the defendants, to be further interrogated on a point concerning which he had already fully testified.

The only points remaining for discussion, which I deem it necessary to notice, relate to the instructions to the jury.

The defendants asked for three instructions, the first of which was given, with a qualification added by the Court, and the two last were properly refused. They do not correctly define the presumptions arising from prior possession, as against a mere intruder without title, or color of title.

At the instance of the plaintiff, the Court gave twelve instructions to the jury, the second of which is in the following words :

"If the jury are satisfied from the evidence given in this cause, that George Treat entered upon and inclosed the Potrero in the year 1850, and are further satisfied that he then made a complete inclosure of the same, and that such inclosure was sufficient to turn and protect stock, and that he actually used such inclosure for that purpose up to the

time of the alleged conveyance to Dyson, and that he deeded the same to Dyson, and that the land was used by Dyson subsequent thereto, for the purpose of pasturage, and that the land was suitable for pasturage; and that the defendants, or either of them who have answered, or those under whom they claim, entered adversely and subsequent to the completion of said inclosure, and while the said land was being so used by said Treat prior, and, by said Dyson, after said conveyance, you will find for the plaintiff against such defendant, or defendants, provided such defendant, or defendants, was occupying the premises at the time of the commencement of this suit."

This instruction is objected to by the defendants as wholly unauthorized by the testimony, and calculated to mislead the jury.

There is no contrariety in the evidence as to the natural features of the Potrero, nor as to the acts performed by Treat or Dyson, which, it is claimed, amounted, in law, to an inclosure and to the actual possession of the land. The testimony shows the Potrero to be a peninsula, containing about one thousand acres; bounded on the north by Mission creek and bay, on the east by the bay of San Francisco, on the south by the same bay and Precita creek, and on the west by a stone wall and ditch, running from Mission creek on the north to Precita creek on the south, across the neck of the peninsula. It further appears that the wall and ditch were ancient works, probably built by the priests of the adjoining Mission of Dolores at an early day; and that in 1850, they had become considerably dilapitated, so as no longer to prevent the ingress and egress of cattle; that John Treat, or George Treat, or the two jointly, in the summer or autumn of 1850, repaired the wall and ditch, so as that, thereafter, it was sufficient to turn cattle; that they erected a gate in the wall, through which admission was had to the Potrero, and a small corral, for herding cattle, inside the wall, together with a shanty, in which the gate-keeper resided; that, immediately after the wall was repaired and the gate erected, they commenced to receive horses for pasturage and used the Potrero for that purpose—having, at times, several hundred head of horses pasturing there for hire;

that, whilst the land was being thus used, John Treat relinquished to George Treat all his interest in the premises, who thereafter continued to use the land for pasturage, as it had before been used, until February, 1852, when he conveyed, by deed, to Dyson, all his interest in the property; and thereafter Dyson used the land for pasturage up to the time when the defendants entered; that the wall and ditch, together with the creeks and bay, formed an inclosure sufficient to protect and turn cattle; that, in 1850, and for several years thereafter, the Potrero afforded grass suitable for pasturage.

If the fact does not sufficiently appear in proof, the Court will take judicial notice, that the Potrero, in the year 1850, was separated from the City of San Francisco, as it then was, only by Mission creek and bay, and that it is now a portion of the city, divided into lots, blocks and streets. Courts take judicial notice of the geographical divisions of counties and incorporated cities, and of current events of general notoriety, and of the ports and waters of the State in which the tide ebbs and flows. (*People* v. *Smith*, 1 Cal. 9; *United States* v. *La Vengeance*, 3 Dall. 297; *Peyroux* v. *Howard*, 7 Pet. 341.)

In *United States* v. *La Vengeance*, the Court took judicial notice of the geographical position of Sandy Hook. In the case of *The Apollon* (9 Wheat. 374), the Court held that it was bound to take judicial notice of public facts and geographical positions; and, in *Peyroux* v. *Howard*, that it would take judicial notice of the position of the City of New Orleans, and whether the tide ebbed and flowed there. "In fine, Courts will generally take notice of whatever ought to be generally known within the limits of their jurisdiction." (1 Greenl. Ev. Sec. 6.)

It would be an absurdity to hold that the Courts of this State will not take judicial notice of the position of the City of San Francisco and of Mission bay, the northern boundary of the Potrero, or of Mission creek, which is declared by law to be a navigable stream, and in which the tide ebbs and flows. Nor can the Court assume to be ignorant of the fact that the Potrero is divided into lots, blocks and streets,

which is a fact of such universal notoriety as to render proof of it unnecessary.

These being the facts of the case, do they establish, or tend to establish, in George Treat or Dyson such an actual possession of the whole Potrero, as to have justified the Court in giving the instruction above quoted?

For the plaintiff, the argument is, that the two creeks, the bay and the wall and ditch formed a perfect inclosure, capable of turning and protecting cattle, and that it would be an absurdity to hold that a fence, along the margin of the bay and creek, was necessary, in order to establish their possession, when those natural barriers formed a more perfect defense than any artificial structure could have done; that, by repairing the wall and erecting the gate, Treat and Dyson held the only means of access to the property, and that it was more suitable for pasturage than for any other purpose, in its then condition, and they used it in that way; that, by these means, they subjected the property to their exclusive dominion and control, and had the actual possession, the *possessio pedis*, until they were intruded upon by the defendants, who were trespassers without title.

On the other hand, the defendants claim that where so large a body of land is surrounded—except across a narrow neck of it—by tide waters, having a beach on which the public has a right to land and to use for any lawful purpose, a fence across the neck does not, of itself, give possession of or dominion over the whole peninsula; that a beach on tide waters is a public highway, and is no more effective, as an inclosure, than a public road would be; that, though a precipitous bluff or cliff may be sufficient to form a part of an inclosure, whether it front on navigable waters or not, there is no proof in this case of any such bluff or cliff, nor of any barrier along the beach, except the water; that there having been no sufficient inclosure to constitute possession of itself, the mere temporary use of the land for pasturage, and particularly unaccompanied by a *bona fide* claim of title, is not, under the former decisions of this Court, such a *possessio*

CAL. REP. XXXIX.—6.

*pedis* as will maintain ejectment; that, devoting to the purpose of pasturing, merely, so large a body of land, immediately contiguous to a large city, is not such an exercise of dominion over it, nor such a subjection of it to the will and control of the party, as to constitute a *possessio pedis;* that it appears from the *complaint*, that the land in contest is bounded partly by a marsh, and that a marsh is not, *per se*, and, in the absence of proof explaining its character, such an obstruction as to form a natural barrier against the inroads of cattle.

When the instruction refers to a "complete inclosure" of the Potrero by George Treat, we must construe this phrase in reference to the proofs. There was not the slightest evidence of any "inclosure" of the Potrero by Treat, except such as resulted from repairing the wall and ditch. We cannot, therefore, infer that this instruction was founded on the hypothesis that there was the least evidence tending to prove that Treat erected a fence, ditch or wall around the entire Potrero.

The Court evidently intended to say to the jury, that if Treat repaired the wall and ditch in such a manner, that, together with the other natural barriers, it formed a complete inclosure, sufficient to turn cattle, and if the land was suitable for pasturage, and was used by Treat, and afterwards by Dyson for that purpose, up to the time of the entry by the defendants, then, that there had been established in Dyson such *possessio pedis* as entitled the plaintiff to recover. We think the jury could not have failed to understand the instruction in this light, and could not, therefore, have been misled by it in this respect; and particularly when considered in connection with the fourth instruction, which refers more definitely to the inclosure by means of the wall and ditch, and by the creeks and waters of the bay.

We have carefully considered the able and ingenious argument of the defendants' counsel, to the effect that the tide waters of the bay, with a beach in front of them, on which the public was free to land, and to use for any legitimate purpose, would not constitute a sufficient barrier on that

side to form a portion of a complete inclosure, in a legal sense.    But we think their proposition is not tenable.    If it were, the result would be that a tract of land, completely inclosed with a substantial fence on three of its sides, and with the fourth side fronting on the ocean, could not be held to be inclosed ; or that an island in the ocean could not be deemed to be sufficiently inclosed, unless it had precipitous cliffs, or some sufficient artificial inclosure all around it. A proposition cannot be sound, which necessarily leads to such absurd results.

Nor is there any force in the argument that the verdict should be set aside because the complaint states the land to be in part bounded on one side by a marsh.    It is evident that a marsh may not only be so sharply defined, where it meets the upland, as to accurately mark a boundary, but it may be also utterly impenetrable by man or beast.    We need no definition by lexicographers to satisfy us that marshes are often of this character.    If it be claimed that the proof fails to show that this particular marsh was of that character, and that this was a material fact to be proved by the plaintiff to support the verdict, the answer is two-fold : First—That all the presumptions are in support of the judgment ; and, Second—That the defendants, in their statement on the motion for new trial, failed to specify wherein the evidence was insufficient, and it is too late to raise the point for the first time in this Court.

This brings us to the consideration of what we deem to be the most important and difficult point in the case.    We assume that the Court, in the instruction on which we have been commenting, clearly intended to say to the jury—and that the jury so understood it—that if Treat repaired the wall and ditch, and if these, together with the creeks and waters of the bay, formed a sufficient inclosure to turn cattle, and if the land was suitable for pasturage, and was used by Treat and afterwards by Dyson for that purpose, up to the time of the entry by the defendants, without title, that, in that event, it resulted, as a conclusion of law, that there had been established in Dyson such a *possessio pedis* as entitled the plaintiff to recover.    For the reasons already stated, we

must assume that the facts referred to in the instruction were satisfactorily proved. But did the Court draw a correct conclusion of law from these facts? Conceding every fact hypothetically stated in the instruction to have been proved, Did Dyson have such a *possessio pedis* as entitled him to recover? This Court has repeatedly had occasion to define what constitute such a possession; and, under ordinary conditions, there is but little difficulty in applying the law to the facts. In *Coryell* v. *Cain* (16 Cal. 573), which is a leading case in this State on that point, we define actual possession to be "a subjection to the will and dominion of the claimant, and it is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property." In *Plume* v. *Seward* (4 Cal. 96), it is said that to maintain an action on the ground of prior possession, "there must be an actual *bona fide* occupation, a *possessio pedis*, a subjection to the will and control, as contradistinguished from the mere assertion of title and the exercise of casual acts of ownership, such as recording deeds, paying taxes," etc. In *Wolf* v. *Baldwin* (19 Cal. 313), in stating what kind of "actual occupation" was required under the Van Ness Ordinance, the Court says it was a "possession which is accompanied with the real and effectual enjoyment of the property. It is the possession which follows the subjection of the property to the will and dominion of the claimant to the exclusion of others; and this possession must be evidenced by occupation, or cultivation, or other appropriate use, according to the locality and character of the particular premises. * * * It must, in other words, be an open, unequivocal, actual possession — notorious, apparent, uninterrupted and exclusive — carrying with it marks and evidences of ownership, which apply in ordinary cases to the possession of real property."

But we need not multiply authorities on a point concerning which there can be little or no difference of opinion. The only difficulty lies in the application of these principles to the case at bar. It is clearly established, both by reason and authority, that the acts of ownership and dominion over

land, which may be sufficient to constitute an actual posses-
sion, vary according to the condition, size and locality of the
tract.   If it contains but one acre, and have upon it a valu-
able quarry of stone or marble, and be not adapted to any
other use than as a quarry, and if it be openly claimed and
actually and notoriously used for that purpose, for a reason-
able time, this might be such an act of dominion over it as
to establish an actual possession, even though there was no
inclosure or residence upon it.  So if it be a small parcel, con-
taining a mine, the working of the mine, in the usual manner,
might establish an actual possession at common law, without
the aid of our mining laws and in the absence of any inclos-
ure.   But if the tract contain one thousand acres, with a
mine or a quarry on one margin of it, no one would main-
tain that the mere working of the mine or quarry, without
other acts of ownership, would establish a possession of the
whole tract.   This proposition is well illustrated by the case
of *Ewing* v. *Burnet* (11 Pet. 41), in which the contest re-
lated to a rugged lot in the City of Cincinnati, only valuable
for the sand and gravel which it afforded for the use of the
inhabitants.  The lot was not inclosed or inhabited; but the
party who claimed it resided in the vicinity, and for a series of
years, sold sand and gravel from it, issued licenses to others
to dig sand and gravel there and sued trespassers upon it.
The Supreme Court held these acts of dominion to be suffi-
cient to establish an adverse possession.  In delivering the
opinion of the Court, Justice Baldwin says: "Neither actual
occupation, cultivation or residence are necessary to consti-
tute actual possession, when the property is so situated as
not to admit of any permanent, useful improvement; and
the continued claim of the party has been evidenced by pub-
lic acts of ownership, such as he would exercise over prop-
erty which he claimed in his own right, and would not
exercise over property which he did not claim."

The same principle might be illustrated by numerous
examples.  Acts of dominion over a town lot, which would be
sufficient to establish an actual possession, might be wholly
inadequate to that end, as applied to a tract of one thousand
acres; and, on the other hand, the herding of cattle, for a

reasonable time, on a tract of one hundred acres, suitable only for that purpose, and accompanied by a claim of title, might, under certain circumstances, establish possession of it; whilst the pasturing of cattle on a town lot, suitable only for building purposes, would be wholly insufficient. The general principle which underlies all this class of cases is, that the acts of dominion must be adapted to the particular land, its condition, locality and appropriate use. The philosophy of the rule is, that by such acts the party proclaims to the public that he asserts an exclusive ownership over the land, and the acts which he performs are in harmony with his claim of title. Hence they must be such as to give notice to the public; or, in the language of Justice Baldwin, in *Wolf* v. *Baldwin (supra)*, it must be "an open, unequivocal, actual possession—notorious, apparent, uninterrupted and exclusive—carrying with it the marks and evidences of ownership."

In this case the Court held, as a conclusion of law, that by repairing the wall and ditch, and using the land for pasturage, if it was suitable for that purpose, and, if the inclosure was sufficient to turn cattle, Dyson did all that was necessary to notify the public of his claim, and to establish an actual possession in law.

If Treat had inclosed the Potrero by a fence or ditch entirely around it, and sufficient to turn cattle, it would not admit of discussion, that, by the inclosure alone, and without other acts of dominion, he would have established an actual possession of the land. An inclosure of that character, is, in itself, sufficient proof of an actual possession. But it is so, only, because of the erection of the artificial barrier is an open, notorious act of dominion, proclaiming in unmistakable terms to the public that the land is appropriated and set apart from the adjoining lands for the exclusive use of the person who erected the barrier. A mere *intention* to occupy land, however openly proclaimed, is not possession. The intention must be carried into actual execution by such open, unequivocal and notorious *acts* of dominion, as plainly indicate to the public that the person who performs them has appropriated the land and claims

the exclusive dominion over it. Anything short of this, is not what the law denominates actual possession. A substantial inclosure, erected by the party around the entire tract, is such an act of dominion, and has been held by the Courts to be of itself sufficient to establish the possession. Nor can it be doubted that a sufficient inclosure, partly by artificial and partly by natural barriers, may, under certain circumstances, establish an actual possession. If, for example, a tract be inclosed on three of its sides by a substantial fence, and the fourth side front upon the ocean, or a deep river, or a precipitous cliff, the erection of the fence would, doubtless, clearly enough indicate to the public that the land was appropriated; or, if there be a small peninsula, containing but a few acres, a fence across the neck of it might accomplish the same result. But it is evident that where natural barriers form much the greater portion of the inclosure, the rule to which we have adverted is not of universal application, but must be varied according to the circumstances of each particular case. A fence or ditch across the neck of a small peninsula, could not well escape observation, and would bear such a relation to the land, and to the natural use of it, as to indicate clearly to everyone who saw it, that it was intended to segregate the peninsula from the adjoining lands, and that it had been appropriated by the person erecting the barrier. As was said by the Court, in *Wolf* v. *Baldwin,* it would be such an act of dominion as to carry with it "the marks and evidences of ownership, which apply, in ordinary cases, to the possession of real property." But the same rule could not, without absurdity, be applied to all peninsulas, however large and howsoever situate. The City of San Francisco is situate on a peninsula, containing many square leagues of land; at the narrowest point of which, in the vicinity of Redwood City, it is but a few miles across the neck from the bay of San Francisco to the shore of the ocean.

If the rule we are discussing was of universal application, a fence from Redwood City to the sea shore, including the entire peninsula, would establish an actual possession—a *possessio pedis* of the whole of it; and if the rule were uni-

versal and without qualification, the same result would follow if the peninsula were ten times as large as it is. The Courts should hesitate long before establishing a rule of such universal application, as to lead to these absurd results. But such cases do not come within the reason of the rule which permits a party, under certain circumstances, to adopt and avail himself of natural obstructions as a part, or, it may be, the whole of an inclosure, in making out a case of actual possession. If the peninsula be so large, or, for any reason, be so situated that it would be contrary to the experience of mankind, and our observation of the motives which govern men in their daily pursuits, that anyone should seek to acquire exclusive dominion over it by means of a fence or ditch, then it could not be held, without an absurdity, that the fence or ditch should, in law, be deemed to be, in itself, such an act of dominion as to establish a *possessio pedis*. The whole theory of a *possessio pedis* rests upon the assumption that the acts of dominion which establish it, are such open, notorious acts of ownership, as *usually* accompany the possession of real property, and naturally spring from a claim of exclusive dominion. They must not only carry with them the *usual indicia* of ownership, but they must be open, notorious and unequivocal, so as to notify the public that the land is appropriated. If these be not necessary ingredients in a *possessio pedis*, and if a fence across the neck of a peninsula, however large or howsoever situate, be all that is requisite to establish such a possession, no reason is perceived why a fence across the isthmus of Darien might not be held to establish a possession in fact of the continent of North America. These extreme cases are referred to only to illustrate the proposition that where the inclosure consists partly of natural and partly of artificial barriers, or wholly of natural obstructions, as in the case of an island, it does not follow, as a conclusion of law, that *every* such inclosure, which is sufficient to turn cattle, establishes, *of itself*, a *possessio pedis*; but it must depend on the particular circumstances of each case, considering the size of the tract, its peculiar condition and the relative proportions which the natural barriers bear to the artificial, and the greater or less

notoriety which, under all the circum:.          surround
the tract, the artificial barriers, or other acts of ⏤wnership,
exercised over the property, give to the claim of dominion.

To avoid misconception on this point, we will illustrate
the proposition by an example : It is a well known fact that
the island of Santa Catalina, lying off the coast of this State,
contains about fifty thousand acres, and is surrounded by
the waters of the Pacific Ocean, which, of course, form a
complete barrier against cattle. In other words, it is com-
pletely inclosed by impregnable, natural barriers. If one
should desire to acquire the actual possession, the *possessio
pedis*, of this whole island, it would not be necessary to
erect artificial obstructions around it, for nature has already
inclosed it more securely than man could do. He might
adopt these natural obstructions as his inclosure, and they
would doubtless form an important link in the chain of facts
tending to establish a *possessio pedis;* but he must perform
other and sufficient acts of ownership to render his claim of
exclusive dominion, apparent and notorious. If he should
go upon the island and erect a hut in the center of it, and
proclaim, in words, that he claimed the whole island, would
this, of itself, establish in him the actual possession of the
whole ? No respectable Court would uphold so preposterous
a claim. Nor would it materially strengthen his claim of
exclusive dominion, if it should appear that he pastured a
few cattle or cultivated a patch of land on the island, for the
obvious reason that these trivial acts of ownership are not
the usual and natural means by which exclusive dominion is
acquired or exercised over so large a body of land, similarly
situated, and would tend, in a very small degree, to give
notoriety to his claim, and to inform the public that the
whole island was appropriated for his exclusive use. On
the contrary, if he should settle upon the island with the
intention to acquire the possession of it, should pasture
large herds of cattle upon it, allowing them to roam all over
it, or cultivate extensive fields on various portions of it,
should prevent others from landing on it, should cut timber

or open mines and quarries on many remote parts of it, these would probably be held to be such acts of dominion as to establish a *possessio pedis* of the whole. If the island contained but a few acres, much fewer and less important acts of dominion would suffice to establish the possession, for the reason that they would sufficiently serve to render the claim of dominion apparent and notorious. The general principle pervading all this class of cases, where the inclosure consists wholly or partially of natural barriers, is, that the acts of dominion and ownership which establish a *possessio pedis* must correspond, in a reasonable degree, with the size of the tract, its condition and appropriate use, and must be such as usually accompany the ownership of land similarly situated. But, in such cases, it is the peculiar province of the jury, under proper instructions from the Court, to decide whether or not the acts of dominion relied upon, considering the size of the tract, its peculiar condition and appropriate use, were of such a character as usually accompany the ownership of lands similarly situated. As already stated, the erection of a fence across the neck of a small peninsula, might, of itself, under certain circumstances, be a sufficient act of dominion to establish an actual possession. But, in such cases, there can be no rule of universal application, and each case must depend on its own circumstances ; and where an inclosure, consisting partly of natural and partly of artificial obstructions, is relied upon as, in itself, establishing a *possessio pedis*, it is the province of the jury, upon all the proofs, and considering the quantity, locality and character of the land, to decide whether or not the artificial barriers were sufficient to notify the public that the land was appropriated, and to impart to the claim of appropriation the notoriety and *indicia* of ownership which constitute so important an element in a *possessio pedis*. But, in the case at bar, this question was not submitted to the jury. On the contrary, the Court instructed them that if Treat repaired the wall and ditch, so that thereafter they, together with the waters of the creeks and bay, formed an inclosure sufficient to turn cattle, and if the land was suitable for pasturage and was used by him for that purpose,

and if Dyson succeeded to the right of Treat and also used the land for pasturage, then, that these acts established, in law, a *possessio pedis.* But, as already stated, it was the province of the jury, and not of the Court, to decide what effect should be given to the repairing of the wall and ditch as an act of dominion over the property; and whether or not this act, in connection with the pasturing of cattle on the land, considering its quantity, locality and character, was sufficient, under all the circumstances, to notify the public that the land was appropriated; and that Treat, first, and Dyson, as his successor, claimed and exercised the exclusive dominion over it. The Court should have instructed the jury, that, if all the facts hypothetically stated in the second instruction were true, it was the province of the jury to decide, considering the quantity, quality and character of the land, whether or not these acts of dominion were sufficient and had the effect, upon the facts proved, to give notice to the public that Treat, first, and Dyson, as his successor in interest, had appropriated the land and claimed the exclusive dominion over it; and if this be answered in the affirmative, then, that there had been established in Treat, first, and afterwards in Dyson, an actual possession. The vice in the instruction which was given is, that the Court assumed, as a conclusion of law, from the facts hypothetically stated, that if Treat and Dyson performed these acts, they had done all that was necessary to appropriate the land, and to give notice by their acts to the public, that they claimed the exclusive dominion over it; whereas, as we have seen, it was the peculiar province of the jury to decide upon the sufficiency of the acts to impart the requisite notice to the public, and whether or not, under all the circumstances, these acts were such as carried with them "the marks and evidences of ownership, which apply, in ordinary cases, to the possession of real property."

For these reasons, the judgment should be reversed and a new trial ordered.

Mr. Justice WALLACE expressed no opinion.